**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

CLAYTON LOCKETT,

     Petitioner - Appellant,

v.

ANITA TRAMMEL, Interim Warden,[*]
Oklahoma State Penitentiary,

     Respondent - Appellee.

No. 11-6040

---

**APPEAL FROM THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF OKLAHOMA**
**(D.C. No. 5:03-CV-00734-F)**

---

O. Dean Sanderford, Denver, Colorado (David B. Autry, Oklahoma City, Oklahoma, Raymond P. Moore, Federal Public Defender, and Jill M. Wichlens, Assistant Federal Public Defender, Office of the Federal Public Defender for the District of Colorado and Wyoming, Denver, Colorado, with him on the briefs), appearing for Appellant.

Jennifer J. Dickson, Assistant Attorney General of Oklahoma (E. Scott Pruitt, Attorney General of Oklahoma, with her on the brief), Office of the Attorney General of Oklahoma, Oklahoma City, Oklahoma, appearing for Appellee.

---

Before **KELLY, TYMKOVICH,** and **MATHESON,** Circuit Judges.

---

[*] Pursuant to Fed. R. App. P. 43(c)(2), Anita Trammel, who was appointed Interim Warden of Oklahoma State Penitentiary on September 24, 2012, is automatically substituted for Randall G. Workman as Respondent in this case.

**MATHESON**, Circuit Judge.

In August 2000, an Oklahoma state court jury convicted Clayton Lockett of 19 counts, including burglary, assault, rape, and first degree murder. He was sentenced to 2,285 years and 90 days of imprisonment for his non-capital crimes and sentenced to death for his murder conviction. The Oklahoma Court of Criminal Appeals ("OCCA") affirmed Mr. Lockett's convictions and sentence and later denied post-conviction relief.

Mr. Lockett filed a petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 in the United States District Court for the Western District of Oklahoma. He challenged his conviction and death sentence on 15 grounds. The federal district court denied relief but granted a certificate of appealability ("COA") on seven grounds. Mr. Lockett asks this court to grant a COA on three additional issues.

We affirm the district court's denial of habeas relief on all grounds. We also deny Mr. Lockett's request for a COA on additional grounds.

## I. BACKGROUND

### A. *Factual History*

The OCCA outlined the facts of Mr. Lockett's crimes, and "[w]e presume that the factual findings of the state court are correct" unless Mr. Lockett presents clear and convincing evidence otherwise. *Fairchild v. Workman*, 579 F.3d 1134, 1137 (10th Cir. 2009); *see also* 28 U.S.C. § 2254(e)(1) ("[A] determination of a factual issue made by a

-2-

State court shall be presumed to be correct. The applicant shall have the burden of

rebutting the presumption of correctness by clear and convincing evidence.").

As set forth by the OCCA, the relevant facts are as follows:

> At around 10:30 p.m. on June 3, 1999, Bobby Bornt was asleep on the couch at his house in Perry, Oklahoma, when his front door was kicked in. Three men, [Petitioner], Shawn Mathis and Alfonzo Lockett, entered his house and immediately started beating and kicking him. Bornt recognized [Petitioner] because [Petitioner] had recently covered a tattoo for him. [Petitioner] was carrying a shotgun which he used to hit Bornt. After the beating, Bornt's attackers used duct tape to secure his hands behind his back and they gagged him and left him on the couch while they ransacked the house looking for drugs. As Bornt lay restrained on the couch his friend, Summer Hair, approached the open door. She was pulled inside, hit in the face and thrown against a wall. One of the men put a gun to her head and ordered her to call to her friend, Stephanie Neiman, who was outside sitting in her pickup. When Neiman came inside, they hit her several times to get the keys to her pickup and the code to disarm the alarm on her pickup.
>
> The men put all three victims in the bedroom where Bornt's nine-month old son, Sam, had been sleeping. Alfonzo Lockett came into the bedroom and got Hair. He took her into the bathroom where he made her perform oral sodomy on him. He then took her into Bornt's bedroom where he told her to get undressed and he raped her. When he was finished, he left her there and [Petitioner] came into the bedroom. He raped her vaginally and anally and he made her perform oral sodomy on him. When he was finished, he told her to get dressed and she went back into Sam's bedroom with the others. Alfonzo Lockett came into the bedroom and used duct tape to secure Hair's and Neiman's hands behind their backs. He also put tape across their mouths.
>
> [Petitioner] instructed Mathis to look in the garage for a shovel. When he returned with a shovel, the victims were loaded into Bornt's and Neiman's pickups. Bornt and his son were placed in his pickup with [Petitioner]. Hair and Neiman were placed in Neiman's pickup with Mathis and Alfonzo Lockett. They took off driving with [Petitioner] in the lead. They left Perry and drove to a rural area in Kay County. [Petitioner] stopped on a country road where he got out of the pickup he was driving and went over to Neiman's pickup. He made Hair get out and go with him to a ditch where he raped her and forced her to perform oral sex on him.

When he was finished, he took her back to Bornt's pickup. While Hair was sitting in the pickup, Mathis got her and took her back to Neiman's pickup where he made her perform oral sex on him. He grabbed her head and said, "In order for you to live, this is what you have got to do."

While stopped on the country road, [Petitioner] told Mathis to get the shovel and start digging. When Mathis was digging in the ditch, Bornt heard [Petitioner] say, "Someone has got to go." Neiman was taken to the hole dug by Mathis and [Petitioner] shot her. The gun jammed and [Petitioner] came back up to the pickup to fix it. While he was doing this, Bornt could hear Neiman's muffled screams. When the gun was fixed, [Petitioner] went back down to the ditch and shot Neiman again. While Mathis buried Neiman's body, [Petitioner] and Alfonzo Lockett warned Bornt and Hair that if they told anyone they would be killed too. They then drove both pickups to another location where they left Neiman's pickup. All of them rode back to Bornt's house in his pickup. [Petitioner], Mathis and Alfonzo Lockett dropped off Bornt, his son and Hair at Bornt's house and they left in Bornt's pickup.

The following day, Bornt and Hair told the Perry police what had happened. Neiman's pickup and her body were recovered and [Petitioner], Mathis and Alfonzo Lockett were subsequently arrested. [Petitioner] was interviewed by the police three times. The first time he terminated the interview and asked for an attorney. He later reinitiated the interview and although he denied shooting Neiman during the second interview, he confessed to having killed her in a third interview.

*Lockett v. Oklahoma*, 53 P.3d 418, 421-22 (Okla. Crim. App. 2002).

Mr. Lockett presents additional facts in his brief to challenge the OCCA's inferences on several issues, which we address later as they become relevant to our discussion.

B. *Procedural History*

1. *Mr. Lockett's Trial: Guilt Phase*

The State charged Mr. Lockett with 19 counts: Conspiracy (Count 1), First Degree Burglary (Count 2), Assault with a Dangerous Weapon (Counts 3, 4 and 5),

-4-

Forcible Oral Sodomy (counts 6, 15, and 16), First Degree Rape (Counts 7, 8, 9, and 14), Kidnapping (Counts 10, 11, 12, and 13), Robbery by Force and Fear (Counts 17 and 18), and Murder in the First Degree (Count 19).

    a. ***The State's Evidence***

At trial, the State introduced a videotaped confession by Mr. Lockett, in which he provided a lengthy and detailed narrative of the evening's events. He confessed to going to Mr. Bornt's home to rob him; to personally hitting and beating Mr. Bornt, Ms. Hair, and Ms. Neiman with his fists or with the shotgun; to binding the victims with duct tape; to planning to kill all three adult victims; to forcing them (along with the baby) to leave Mr. Bornt's house and go to the country, where the adults were to be killed; to taking Ms. Neiman's and Mr. Bornt's trucks; to being the ultimate decision maker as to which victims would be killed; to instructing Mr. Mathis on how to dig the grave; to personally shooting Ms. Neiman while she cried; to threatening to kill them if they told anyone of his crimes; and to insisting that his accomplices bury Ms. Neiman when he knew she was still alive.

Mr. Lockett denied sexually assaulting Ms. Hair at the house or at the murder site. He also denied any knowledge of Alfonzo Lockett sexually assaulting Ms. Hair, but he admitted knowing that Mr. Mathis had sexually assaulted her at the murder site.

Mr. Lockett claimed to have done several things to help the victims. For example, he said that he held, comforted, and fed Mr. Bornt's young son at the house and made sure that the child's diaper was changed at the murder site. He said that he had massaged

Mr. Bornt's legs after removing the tape because they had become numb while he was bound. He also said that he and his accomplices had cleaned Mr. Bornt's house when they returned from the country and that he had expressed concern about Mr. Bornt's head injury and urged him to seek medical attention.

Throughout the videotaped confession, Mr. Lockett's demeanor was relaxed and conversational. He made no statements of remorse. The federal district court described the confession as "a step-by-step account of the evening," which Mr. Lockett delivered "[w]ith clarity, detail and the absence of emotion." *Lockett*, CIV-03-734-F at 14. Mr. Lockett explained that he initially planned to kill all of his adult victims so that the police would not find out that he had violated his probation by leaving his home county. He said that he ultimately decided to kill Ms. Neiman because she said that she would tell the police about his crimes. He calmly spoke of watching his accomplices bury Ms. Neiman while she was still alive, describing her coughing while the dirt hit her face.

The surviving adult victims, Mr. Bornt and Ms. Hair, also testified. Their testimony was largely consistent with Mr. Lockett's confession with respect to the crimes charged.[1] Both victims described their experiences throughout that night. They told the jury that Mr. Lockett had beaten, bound, and gagged them and that he threatened to kill

---

[1] Their testimony did not, however, support portions of Mr. Lockett's confession in which he claimed to have helped the victims. For example, Mr. Bornt did not remember seeing Mr. Lockett hold or comfort the baby, and Ms. Hair testified only that Alfonzo Lockett (whom she referred to as "the little one") had held and helped feed the baby. Mr. Bornt testified that Mr. Lockett had not helped massage his legs or expressed concern about Mr. Bornt's head injury.

-6-

them. Both testified to hearing the men planning to kill them and take the baby to a shelter or to Mr. Bornt's parents' house. Ms. Hair testified to seeing one of the men hit Ms. Neiman multiple times. She testified that Ms. Neiman was bleeding from a head injury after the beating. Mr. Bornt testified to seeing Mr. Lockett shoot Ms. Neiman twice and to hearing muffled screams from Ms. Neiman in the few minutes that lapsed between the two shots. He testified that the men laughed about "how tough [Ms. Neiman] was" when she did not die immediately after the first shot. Tr. IX at 1629.

Ms. Hair testified that Mr. Lockett had sexually assaulted her multiple times, at the house and at the murder site. She testified that both of Mr. Lockett's accomplices had sexually assaulted her. She told the jury that while assaulting her, Mr. Mathis had said "in order for you to live, this is what you have got to do." Tr. X at 1746.

The State introduced photographs of Mr. Bornt and Ms. Hair taken more than a week after the crimes. In the photographs, both victims' faces and bodies are bruised. Both victims described to the jury how their injuries appeared immediately after the event. Mr. Bornt described bleeding from his injuries earlier in the evening, and Ms. Hair said that her eye had been swollen shut. Ms. Hair testified to losing consciousness more than once during the evening as a result of her head injury.

Over Mr. Lockett's objections, the State also introduced photographs of Ms. Neiman's body being recovered from the shallow gravesite.

b. *Mr. Lockett's Lack of Defense*

Mr. Lockett's trial counsel did not present a defense. In his opening statement,

counsel told the jury that Mr. Lockett had no defense. He referred to the prosecutor's statement that the jury would have "no doubt, not just beyond a reasonable doubt, but no doubt" of Mr. Lockett's guilt and conceded that the prosecutor was right. Tr. VIII at 1263. Mr. Lockett contends that his trial counsel did not consult with him before making these statements to the jury.

Counsel did, however, ask the jury to hold the State to its burden to prove every element beyond a reasonable doubt, stating that the initial guilt phase was still necessary because "[t]he law in Oklahoma does not allow me to come in here and tell you, as a jury, we have done it, this happened, now sentence us." *Id.* at 1263.

At closing arguments, trial counsel offered no argument with respect to the first degree murder charge. Mr. Lockett contends that his counsel conceded his guilt without notifying him of this planned strategy.

The jury convicted Mr. Lockett on all 19 counts.

### 2. *Mr. Lockett's Trial: Penalty Phase*

The State sought the death penalty. During the penalty phase, the State alleged five aggravating circumstances: (1) Mr. Lockett had previous felony convictions "involving the use or threat of violence"; (2) he "knowingly created a great risk of death to more than one person"; (3) "the murder was especially heinous, atrocious, or cruel"; (4) the murder was committed to avoid or prevent "a lawful arrest or prosecution"; and (5) he was likely to commit future "acts of violence that would constitute a continuing threat to society." *Lockett*, 53 P.3d at 421.

a. *The State's Aggravating Evidence*

The State presented two witnesses who testified about Mr. Lockett's prior conviction for burglary and a prior instance of witness intimidation.

The State also presented testimony from five correctional officers regarding Mr. Lockett's behavior in jail after his arrest and before his trial. One officer testified that Mr. Lockett had written several threatening letters. Some letters were addressed to friends outside jail in which Mr. Lockett suggested that his Crips gang should kill Mr. Bornt and Ms. Hair. He claimed to be tracking their movements and demonstrated this by providing accurate Social Security numbers, addresses, and other private information for Mr. Bornt and Ms. Hair. In another letter, written to a relative, Mr. Lockett made threats against Alfonzo Lockett for his cooperation with the investigation.

All of the corrections officers who testified described Mr. Lockett's misbehavior in jail, including weapons he made (some of which he voluntarily gave to guards) and threatening statements to guards. The jury heard about other letters written to jail personnel, in which Mr. Lockett falsely boasted that he had an IQ of 190 and a black belt in two martial arts, that he had stabbed multiple corrections officers and once started a prison riot, and that his gang would prevent him from being convicted.

Finally, the State presented victim impact testimony in the form of a statement prepared by Ms. Neiman's parents and read by an extended family member. In their statement, the Neimans characterized the crimes and directly asked the jury to sentence Mr. Lockett to death. They described what Ms. Neiman was like as a child and the future

plans and goals she had before she died. They described their experiences when Ms.

Neiman did not come home, when they searched for her, and when they learned she had

been kidnapped and shot. The federal district court quoted the following excerpt of this

statement:

> The police told me what had happened. Stephanie gave Summer a ride to Bobby Bornt's house. When Stephanie went in, they tried to get her truck keys. They have a struggle. Stephanie is not going to give up her truck keys, because she's very proud of her truck. . . . [S]he works every day. So, of course she's not going to give up her truck. . . The next thing she knows, Clayton [Lockett] hits her over the head with a shotgun. They tell me that they duct-tape Stephanie's hands and mouth where she cannot scream or yell at them anymore. That['s] because Stephanie is going to stand up for her rights no matter what. . . . Why didn't, at any point, didn't any of them leave? . . . . If Shawn [Mathis] was so scared of Clayton, why didn't they leave them when [Clayton Lockett was in the other truck]?. . . .
>
> Stephanie didn't know him, didn't owe him anything. She stood up for what was her right and for what she believed in. And when Clayton asked her if she would tell, she said, yes, she would tell. Right is right and wrong is wrong. Maybe that's what Clayton was so scared of, because Stephanie did stand up for her rights. She did not back down to him. She did not blink an eye at him. If you ask Stephanie a question, she's not going to lie to you. She's going to tell you the truth.

Tr. XIII at 2317-19. The statement concluded with this request:

> [F]or killing our only child, Stephanie, we ask this jury to sentence him to death.

*Id.* at 2324. At least one juror was moved to tears by the Neimans' statement.

-10-

b. ***Mr. Lockett's Mitigating Evidence***

In the penalty phase, defense counsel asked the jury to remember that he had been up front with them during the first stage. Tr. XIII 2169. He conceded that Mr. Lockett's crimes were brutal, but he urged the jury to "spare his life" out of "sympathy" or "empathy." *Id.* at 2185.

Mr. Lockett's mitigation evidence focused on his childhood trauma. He presented testimony from three family members (his stepmother, aunt, and uncle) and two expert witnesses. Family members testified that Mr. Lockett's mother abandoned him when he was three years old and that he was devastated by this abandonment. They testified that after this abandonment, the young Mr. Lockett became extremely attached to his father and idolized him. But Mr. Lockett's father was abusive and a poor role model. His father severely abused him physically, forced him to use drugs beginning at age three, encouraged sexual activity, and watched pornographic movies in front of him when he was very young. These family members also testified that Mr. Lockett's father was a criminal who taught him to steal and punished him if he was caught. Finally, family members testified that Mr. Lockett was likely sexually abused by his older brother and that he sucked his thumb and wet the bed until he was 12.

The first expert witness was social worker Joyce Turner. Ms. Turner was prepared to testify about specific traumatic events and circumstances in Mr. Lockett's childhood. She intended to share specific facts she had learned about Mr. Lockett's childhood and to offer her opinion that this trauma contributed directly to his adult criminal behaviors.

The State filed a motion in limine to prevent Ms. Turner from testifying, arguing that she was unqualified. The trial court granted the motion in part. It concluded that Ms. Turner was qualified to testify in general terms about how certain types of experiences may affect children, but it limited her testimony to these generic theories. The court reasoned that because her training did not qualify her to diagnose psychological illnesses, she was unqualified to testify about Mr. Lockett as an individual. Ms. Turner was therefore prevented from discussing facts specific to Mr. Lockett or his life and was unable to offer her opinion about how Mr. Lockett's childhood experiences affected him.

Ms. Turner testified in generalities, telling the jury that certain types of childhood trauma were harmful to emotional development, especially physical and sexual abuse and/or abandonment that occurs within the first three years of a child's life. She testified that these experiences can cause children not to trust others as they grow up, citing bedwetting and thumb-sucking as common symptoms of emotional damage. Ms. Turner explained that anger from these experiences can build up to dangerous levels and can cause individuals to become aggressive as adults.

As a result of the trial court's decision to limit Ms. Turner's testimony, the jury did not hear certain facts about Mr. Lockett's childhood that were not introduced through other sources. For example, jurors did not hear that Mr. Lockett's father threatened him with a gun when he was a child or that this father taught him "that women are 'no good' and exist only to 'do what you wish.'" Aplt. Br. at 35; Tr. XIV at 2513. They also did

-12-

not hear that Mr. Lockett's mother used drugs while pregnant with him or that he experienced a bad fall and concussion as a child. Furthermore, the jury was not able to hear Ms. Turner's opinion that there "was a direct connection between [Mr.] Lockett's abusive background and his crimes." Aplt. Br. at 38.

Mr. Lockett's second expert witness was Dr. John Smith, who performed a neurological and psychiatric exam on Mr. Lockett at the jail. He testified that Mr. Lockett suffered from post-traumatic stress disorder and was extremely psychologically damaged as a result of his childhood, especially his mother's abandonment. Dr. Smith described additional trauma Mr. Lockett experienced as a child and adolescent, including being raped by several men at age 16 while he was incarcerated at an adult correctional facility.

Dr. Smith told the jury that these traumatic events had affected Mr. Lockett's brain development. He further testified that Mr. Lockett's upbringing and experiences had taught him anti-social attitudes and behaviors, such as "toughness," "gangness," and "meanness." Tr. XV at 2665. He insisted, however, that Mr. Lockett was not a psychopath and that Mr. Lockett had feelings of remorse and empathy, especially toward young children.

c. *The State's Rebuttal Witness*

In response to Dr. Smith's testimony, the State presented rebuttal testimony from Dr. John Call.

Before trial, Mr. Lockett briefly explored the possibility of asserting an insanity

defense. At the time, both parties agreed that if Mr. Lockett pursued this defense, the State would bear the ultimate burden of proving that Mr. Lockett was sane at the time of the crimes. Mr. Lockett and his trial counsel therefore agreed that the State was entitled to have its own expert evaluate Mr. Lockett for this purpose. Dr. Call interviewed Mr. Lockett for one-and-a half to two hours.

Because Mr. Lockett ultimately chose not to present an insanity defense, neither party introduced evidence related to his mental health during the guilt phase of trial. During the penalty phase, however, the State called Dr. Call to offer an opinion regarding Mr. Lockett's future dangerousness and to rebut Dr. Smith's psychiatric testimony. In response to a defense objection that Dr. Call's testimony violated doctor-patient privilege, the State argued that Dr. Call's opinion was based upon multiple sources, including interviews with other witnesses, reports, and Mr. Lockett's videotaped confession. Even so, the prosecutor acknowledged that he "would have to assume" that information Dr. Call had gathered in the interview was "interwoven" throughout his opinion and testimony. Tr. XV at 2727.

The trial court allowed the testimony. Dr. Call told the jury that he had interviewed Mr. Lockett and tried to administer a personality test but that Mr. Lockett had refused to cooperate. But even without the personality test, Dr. Call testified, he was able to conclude that Mr. Lockett did not suffer from any mental illness. Dr. Call asserted that Mr. Lockett displayed no symptoms of post-traumatic stress disorder. Dr. Call testified, however, that Mr. Lockett had anti-social personality disorder and was a

-14-

psychopath.

### d. *The Jury's Sentencing Decision*

The jury found that all five aggravating circumstances were present and sentenced Mr. Lockett to death for first degree murder. For the non-capital crimes, the jury assessed a total punishment of 2,250 years and 90 days of imprisonment.

### 3. *Mr. Lockett's Direct Appeal*

Mr. Lockett appealed to the OCCA, alleging 15 reversible errors, including the six issues we review on appeal. The OCCA found error on several issues but concluded that reversal was unwarranted.

The OCCA agreed with Mr. Lockett that the trial court erred in limiting Ms. Turner's mitigation testimony, but it found the error harmless beyond a reasonable doubt. *See Chapman v. California*, 386 U.S. 18 (1967). The OCCA also held that portions of the victim impact testimony, specifically, the description of Ms. Neiman as a child and discussion of her future goals, violated Oklahoma law. However, the OCCA concluded that this "improper" admission did not violate the Eighth Amendment or the Due Process Clause, stating "[t]here was no constitutional violation here." *Lockett*, 53 P.3d at 427.[2]

---

[2] The OCCA raised one additional concern regarding Mr. Lockett's trial. During the initial voir dire process, the trial court held individual interviews with 19 potential jurors outside Mr. Lockett's presence. Mr. Lockett claimed that this violated his due process rights. The OCCA held that future trial courts should ensure that the defendant is present for all voir dire proceedings, but it nevertheless concluded that Mr. Lockett's absence from these portions of jury voir dire did not rise to the level of constitutional error.

Continued . . .

The OCCA affirmed Mr. Lockett's conviction and sentence. Mr. Lockett

petitioned the United States Supreme Court for a Writ of Certiorari, which was denied on

April 21, 2003. *Lockett v. Oklahoma*, 538 U.S. 982 (2003). Mr. Lockett then sought

post-conviction relief from the OCCA, which was denied. *Lockett v. State*, No. PCD-

2002-631 (Okla. Crim. App. Oct. 22, 2002) (unpublished).

### 4. *Mr. Lockett's § 2254 Petition in Federal District Court*

Mr. Lockett filed a petition for a writ of habeas corpus pursuant to 28 U.S.C.

§ 2254 in the United States District Court for the Western District of Oklahoma.

He asserted 15 grounds for habeas relief: (1) his exclusion from portions of voir

dire; (2) ineffective assistance of trial counsel (three separate claims);[3] (3) suppression of

_____

Cont.

The federal district court agreed and denied Mr. Lockett's request for a COA on this ground. Mr. Lockett has asked this court to expand the COA to include this ground. We discuss the issue at the conclusion of this opinion.

[3] In his direct appeal, Mr. Lockett made two claims for ineffective assistance of counsel. The first concerned trial counsel's alleged concession of guilt during the first phase of trial. The second claim concerned counsel's alleged failure to "marshal . . . evidence of his mental illness into a coherent defense strategy" during the penalty phase. *Lockett*, P.3d at 424. In his habeas petition, Mr. Lockett added a third claim for ineffective assistance, arguing that counsel should have introduced into evidence a letter of remorse he wrote to Ms. Neiman's parents.

The federal district court addressed the merits of the first two claims and denied relief. It granted a COA on the first claim related to counsel's performance during the guilt phase, and we review the issue in this opinion. Mr. Lockett asks this court to grant a COA on the second claim related to counsel's alleged failure to marshal mental health evidence. We respond to Mr. Lockett's COA motion later in this opinion.

Mr. Lockett presented the third claim regarding the letter of remorse to the OCCA for the first time in his post-conviction petition. The OCCA concluded that this claim

Continued . . .

Ms. Turner's mitigating testimony; (4) insufficient evidence on the aiding and abetting counts; (5) admission of gravesite and exhumation photographs; (6) inclusion of unconstitutional victim impact testimony; (7) inclusion of Dr. Call's testimony based on Mr. Lockett's uncounseled statements; (8) jury instructions regarding weighing of aggravating and mitigating circumstances; (9) constitutionality of the heinous, atrocious, or cruel aggravator; (10) constitutionality of the continuing threat aggravator; (11) inclusion of unreliable evidence of unadjudicated prior bad acts; (12) insufficient evidence to support the great risk aggravator; (13) inappropriateness of the death penalty due to his mental illness; (14) prosecutorial misconduct during the penalty stage; and (15) cumulative error.

The federal district court concluded that the trial court made two constitutional errors. First, the court agreed with the OCCA that the trial court erred in suppressing portions of Ms. Turner's testimony. Second, the court held that the trial court erred in admitting unconstitutional victim impact testimony. Nevertheless, the district court concluded the errors were individually and cumulatively harmless. It therefore denied habeas relief on all 15 grounds. *Lockett v. Workman*, No. CIV-03-734-F (W.D. Okla. Jan. 19, 2011).

_____

Cont.

was procedurally barred because the facts of the claim were available at the time of his direct appeal. The federal district court affirmed. *See Lockett v. Workman,* No. CIV-03-734-F at 20 (W.D. Okla. Jan. 19, 2011). Mr. Lockett does not appeal this determination.

On the same day, the district court granted a COA to Mr. Lockett on seven of the 15 issues: Ground Two (ineffective assistance of trial counsel, as to the guilt-phase only); Three (testimony of Joyce Turner); Four (insufficient evidence of aiding and abetting); Six (victim impact testimony); Seven (testimony of Dr. Call); Twelve (insufficient evidence of the great risk aggravator); and Fifteen (cumulative error). *See Lockett v. Workman*, No. CIV-03-734-F (W.D. Okla. Jan. 19, 2011) (order granting COA).

Mr. Lockett has filed a motion with this court to modify the COA to include three additional issues: Grounds One (right to be present at voir dire); Two (ineffective assistance of trial counsel, as to penalty phase); and Eight (jury instructions at the penalty phase). *See Lockett v. Workman*, No. 11-6040 (10th Cir. Mar. 11, 2011) (appellant's motion to expand COA).

## II. **JURISDICTION AND STANDARD OF REVIEW**

A COA is a prerequisite to appellate jurisdiction in a habeas action. *See* 28 U.S.C. § 2253(c)(1)(A); *Miller-El v. Cockrell*, 537 U.S. 322, 335-36 (2003). We therefore have jurisdiction to review the seven issues on which the district court granted COA pursuant to 28 U.S.C. §§ 1291 and 2253. It appears, however, that Mr. Lockett has abandoned one of these issues—sufficiency of the evidence of aiding and abetting sexual assault. We therefore consider that issue waived and do not address it. "[W]e routinely have declined to consider arguments that are not raised, or are inadequately presented, in an appellant's

-18-

opening brief." *Bronson v. Swensen*, 500 F.3d 1099, 1104 (10th Cir. 2007).[4]

Mr. Lockett has filed a Motion to Modify Certificate of Appealability, in which he asks us to grant a COA on three additional issues. We consider this motion later in this opinion.

The OCCA considered on direct appeal the merits of each of the six claims we review here. Our review is therefore governed by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), which requires federal courts to give significant deference to state court decisions. *See Hooks v. Workman*, 689 F.3d 1148, 1162-63 (10th Cir. 2012) ("This highly deferential standard for evaluating state-court rulings demands that state-court decisions be given the benefit of the doubt." (quotations omitted)). Under AEDPA deference, a federal court's habeas review is limited to determining whether the OCCA's conclusion is "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" or whether the conclusion "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d); *see Harrington v. Richter*, 131 S. Ct. 770, 785 (2011).

---

[4] We note that even if Mr. Lockett had argued this issue successfully on appeal, it would have little practical effect on his sentence. Mr. Lockett was convicted on three charges of aiding and abetting rape and/or oral sodomy (Counts 6, 7, and 16) and sentenced to 475 years for these convictions. These crimes do not affect his death sentence for the first degree murder conviction. Even if Mr. Lockett succeeded in overturning his death sentence *and* the three aiding and abetting convictions, his remaining sentence for the 15 other non-capital convictions would be 1,775 years and 90 days. [*See Lockett*, 53 P.3d at 421.]

"Clearly established law is determined by the United States Supreme Court, and refers to the Court's 'holdings, as opposed to the dicta.'" *House v. Hatch*, 527 F.3d 1010, 1015 (10th Cir. 2008) (quoting *Lockyer v. Andrade*, 538 U.S. 63, 71 (2003)). An OCCA decision is "contrary to" a clearly established law if it "applies a rule different from the governing law set forth in [Supreme Court] cases, or if it decides a case differently than [the Supreme Court has] done on a set of materially indistinguishable facts." *Bell v. Cone*, 535 U.S. 685, 694 (2002). An OCCA decision is an "unreasonable application" of clearly established federal law if it "identifies the correct governing legal principle . . . but unreasonably applies that principle to the facts of petitioner's case." *Wiggins v. Smith*, 539 U.S. 510, 520 (2003) (quotations omitted).

Notably, an application of Supreme Court law may be incorrect without being unreasonable. *Williams v. Taylor*, 529 U.S. 362, 410 (2000). We may reverse only if all "fairminded jurists" would agree that the state court got it wrong. *Richter*, 131 S. Ct. at 786. "[E]ven a strong case for relief does not mean the state court's contrary conclusion was unreasonable." *Id.* at 786. Our review "is limited to the record that was before the" OCCA. *Cullen v. Pinholster*, 131 S. Ct. 1388, 1398 (2011).

Finally, "we review the federal district court's conclusions of law de novo and its findings of fact, if any, for clear error." *Hain v. Gibson*, 287 F.3d 1224, 1229 (10th Cir. 2002).

### III. **DISCUSSION**

We first analyze the six issues on which the federal district court granted a COA

and which Mr. Lockett addresses in his briefs.[5] We address these issues in the order in which the parties briefed them, beginning with five challenges related to the sentencing phase of trial: (A) restriction of Ms. Turner's mitigation testimony; (B) admission of victim impact testimony; (C) admission of rebuttal testimony by Dr. Call; (D) sufficiency of the evidence supporting the great risk aggravating circumstance; and (E) cumulative error. We then turn to the sole guilt-phase issue briefed on appeal, (F) trial counsel's alleged ineffective assistance by conceding guilt.

Finally, we address Mr. Lockett's motion to expand the COA to include three additional issues: (A) the trial court's decision to conduct voir dire interviews with 19 jurors outside Mr. Lockett's presence; (B) trial counsel's alleged ineffective assistance in the penalty phase for failing to marshal specific evidence of mental illness; and (C) the constitutionality of the jury instruction regarding the weighing of aggravating and mitigating circumstances.

## A. *The Erroneous Limitation of Ms. Turner's Mitigation Testimony*

Mr. Lockett asserts that the trial court erred in limiting Ms. Turner's mitigation testimony to generic statements. The OCCA agreed but found the error to be harmless. The federal district court upheld the OCCA's decision under AEDPA deference, and we affirm.

---

[5] As we explain above, a seventh issue included in the district court's grant of COA, insufficient evidence of aiding and abetting, has been waived because Mr. Lockett did not address it in his brief.

1. *Legal Background*

The Eighth and Fourteenth Amendments protect a defendant's right to present mitigating evidence in a capital case.[6] *Lockett v. Ohio*, 438 U.S. 586, 604 (1978). A jury may not be prevented from considering "any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death." *Id.* at 604.[7] Moreover, Oklahoma law allows social workers to render expert opinions like the excluded portion of Ms. Turner's proposed testimony. *E.g.*, *Salazar v. State*, 919 P.2d 1120 (Okla. 1999). Because the State concedes that the limitation on Ms. Turner's testimony was constitutional error, we consider only whether it was harmless.

In a *direct* review of a state court criminal judgment, a constitutional error is harmless only if a court finds that it was "harmless beyond a reasonable doubt."

---

[6] In his opening brief, Mr. Lockett offers this explanation of the role of mitigating evidence:

> By the time a capital case reaches the sentencing stage, the jury's knowledge about the defendant is usually limited to the worst thing he has ever done. . . . If the defendant is to escape [a death sentence], he must convince at least one juror that there is more to him than that terrible day, that despite his crimes the jury should show mercy, that there may be in his past something that helps explain his seemingly senseless crime.

Aplt. Br. at 32.

[7] To avoid confusion with the present case, we refer to the Supreme Court's *Lockett v. Ohio* decision by its full name throughout this opinion.

-22-

*Chapman*, 386 U.S. at 24. But in a collateral review of a state court's criminal judgment, we apply the "more forgiving standard" first articulated in *Brecht v. Abrahamson*, 507 U.S. 619 (1993). *Fry v. Pliler*, 551 U.S. 112, 116 (2007).

Under the *Brecht* standard, an error is deemed "harmless unless it 'had a substantial and injurious effect or influence in determining the jury's verdict.'" *Fry*, 551 U.S. at 116 (quoting *Brecht*, 507 U.S. at 631). A substantial and injurious effect exists if a "court finds itself in grave doubt about the effect of the error on the jury's [sentencing decision]." *Bland v. Sirmons*, 459 F.3d 999, 1009 (10th Cir. 2006). *Brecht* explains that "an error that may justify reversal on direct appeal will not necessarily support a collateral attack on a final judgment." 507 U.S. at 634 (quotations omitted). "However, when a court is "in virtual equipoise as to the harmlessness of the error . . . the court should treat the error . . . as if it affected the verdict . . ." *Selsor v. Workman*, 644 F.3d 984, 1027 (10th Cir. 2011) (quotations omitted).

Because a death sentence requires a unanimous jury, "the ultimate inquiry is: 'Do we harbor a significant doubt that this evidence would have caused at least one juror to choose life rather than death?'" *Moore v. Reynolds*, 153 F.3d 1086, 1110 (10th Cir. 1998) (quoting *Castro v. Oklahoma*, 71 F.3d 1502, 1516 (10th Cir. 1995)).

2. ***The Error Did Not Have a Substantial and Injurious Effect on the Jury's Decision***

Our careful review of the record leads us to conclude that the erroneous limitation on Ms. Turner's testimony did not have a "substantial and injurious effect" on the jury verdict. *Fry*, 551 U.S. at 116.

-23-

We discern in Mr. Lockett's arguments three possible ways in which the excluded portions of Ms. Turner's testimony could have influenced the jury's decision. First, did missing factual details prevent the jury from genuinely understanding the context of Mr. Lockett's childhood experiences? Second, did the absence of Ms. Turner's explicit opinion testimony that Mr. Lockett's adult criminal behavior was connected to his childhood trauma prevent the jury from understanding that this connection may have existed? Third, could the jury have inferred from Ms. Turner's failure to draw this explicit connection that she did not believe such a connection existed?

a. *Missing Facts*

We do not harbor significant doubt as to whether the handful of missing facts had a substantial and injurious effect on the jury's decision. Jurors heard substantial evidence that would have allowed them to understand the context of Mr. Lockett's childhood. The few missing details were not significantly different from the numerous details introduced through the testimony of Mr. Lockett's family members. For example, jurors did not hear that Mr. Lockett's father pointed guns at his family, but they did hear that his father routinely and severely beat his family members, that he was a criminal who taught young Mr. Lockett to commit crimes and punished him for getting caught, and that he showed Mr. Lockett pornography and forced him to do drugs when he was a young child.

Although the missing facts were relevant to mitigation, they were not significantly different in kind from the many facts the jury heard. They represent cumulative evidence of severe child abuse and poor parenting. We therefore harbor no significant doubt about

the effect of these missing facts on the jury's sentencing decision.

b. ***Missing Opinion***

We also do not harbor significant doubts as to whether the omission of Ms. Turner's expert opinion about Mr. Lockett had a substantial and injurious influence on the jury's decision. Taken together, the mitigating evidence, including Dr. Smith's testimony, was sufficient to allow the jury to understand how and why childhood trauma may influence adult behavior. Although she was not able to explicitly state her opinion that Mr. Lockett's adult crimes were tied to childhood trauma, her general testimony pointed to these conclusions.

For example, Ms. Turner testified that abuse and abandonment, especially in the first three years of life, erode children's sense of trust and safety and cause "a buildup of repressed rage" that may eventually release in the form of aggressive behavior. Aplt. Br. at 20. The jury likely understood that these points related to the testimony from Mr. Lockett's family members about the abuse and abandonment he experienced in childhood, including the first three years of life.

Dr. Smith reinforced this connection, testifying that Mr. Lockett was mentally ill as a result of his childhood trauma, which influenced his criminal acts. Dr. Smith testified at length to specific connections between Mr. Lockett's childhood and adolescent trauma, on the one hand, and his brain development and adult criminal behavior, on the other. He told the jury that as a 3-year-old child, Mr. Lockett was abandoned by his mother and "found on [his father's] doorstep, urine-soaked," and that

Mr. Lockett's father frequently stripped him naked and beat him with belts or boards. Tr. Vol. XV at 2637. Dr. Smith told the jury that this type of early childhood trauma "may affect the neuron connections in the brain," which in turn control how he "integrates, perceives, and expresses [himself] throughout life." Tr. Vol. XV at 2633.

According to Dr. Smith, this trauma caused him to develop "an extremely deep mistrust of human relationships." *Id.* at 2642. This led Mr. Lockett to join a gang, which gave him a sense of belonging but also taught him criminal behaviors and "deviant" values. *Id.* at 2643. Dr. Smith said that beneath his "cloak of gangland meanness," Mr. Lockett was "very insecure, full of anxiety" and often felt "very vulnerable." *Id.* at 2649.

Dr. Smith testified that Mr. Lockett had been raped in prison by a group of three men when he was 16 years old and that this experience, along with possible early childhood sexual assault, may have led him to "repress[] or dissociate[]" his sexual assault of Ms. Hair. *Id.* at 2647. Dr. Smith also offered an explanation for why Mr. Lockett allowed two of his victims to live while killing Ms. Neiman: Mr. Lockett may have become enraged at Ms. Neiman's defiance because "his very earliest rage and hurt was from women." *Id.* at 2663. Dr. Smith suggested that Mr. Lockett did not kill Mr. Bornt and Ms. Hair because "he was touched . . . by their quickness and willingness to agree" not to report him and because they had young children and Mr. Lockett knew "what it's like to go without mothering . . . [or] decent parenting." *Id.* at 2664.

In short, Dr. Smith offered a clear and emphatic opinion that Mr. Lockett's crimes were linked to his childhood and adolescent trauma. We therefore do not harbor

significant doubt as to whether the absence of Ms. Turner's opinion on the issue affected the jury's sentencing decision.

### c. *Potential Negative Inference*

Mr. Lockett's strongest argument relates to the third question:  whether the jury may have drawn a negative inference from Ms. Turner's missing analysis.  Mr. Lockett argues that upon hearing Ms. Turner's extensive testimony about hypothetical effects of childhood trauma on individuals, the jury likely expected her to conclude that, in her expert opinion, Mr. Lockett's childhood trauma was connected to his adult behavior. When this opinion did not come, Mr. Lockett argues, the jury may have drawn the false conclusion that Ms. Turner did not believe there was such a connection.

But this potential negative inference does not overcome our highly deferential standard of review.  Although it may have been possible for jurors to conclude that Ms. Turner believed Mr. Lockett's actions were *not* linked to childhood trauma, another inference was just as likely:  that Ms. Turner did not testify to specifics because she was not familiar with Mr. Lockett's individual situation and that it was the role of the other expert witness, Dr. Smith, to provide these specifics.  It is also possible that jurors did not draw any particular inference about what was not included in her testimony.

Moreover, even if jurors did draw a negative inference, it is not likely to have substantially influenced their verdict in the context of all aggravating and mitigating evidence.  Mr. Lockett presented four witnesses in mitigation.  As the State argues, "the jury was well aware of the trials and tribulations [he] faced growing up."  Aplee. Br. at

13. His mitigating evidence was countered by extensive aggravating evidence, including the testimony of Dr. Call and evidence of Mr. Lockett's jailhouse misbehavior (e.g., making weapons and making threats about his surviving victims). Furthermore, certain evidence presented during the guilt phase no doubt influenced the jury's sentencing decision. The jury viewed a videotape of Mr. Lockett's matter-of-fact confession and saw and heard detailed testimony from two surviving witnesses. In the end, the jury found the presence of five aggravating factors beyond a reasonable doubt.

Viewed in this context, we do not find ourselves "in grave doubt" about the effect of the suppressed portions of Ms. Turner's testimony on the jury's sentencing decision. *Bland*, 459 F.3d at 1009 (quotations omitted). We therefore affirm the district court's refusal to grant Mr. Lockett relief on this ground.

## B. *The Admission of Unconstitutional Victim Impact Testimony*

Mr. Lockett asserts that the trial court erred in admitting victim impact testimony that included sentencing recommendations and descriptions of the crime. Relying on its own precedent, the OCCA disagreed and found no constitutional error.[8] The federal district court found that the victim impact testimony violated Mr. Lockett's Eighth Amendment rights under clearly established Supreme Court law. It concluded, however,

---

[8] The OCCA did, however, find that portions of the Neimans' statement "about the victim's childhood and her future plans" were impermissible under Oklahoma law. *Lockett*, 53 P.3d at 427 (citing *Brown v. State*, 989 P.2d 913, 933 (Okla. Crim. App. 1998). The OCCA labeled these portions of the victim impact statement as "improper," but insisted that they did not have any "prejudicial effect" and concluded "[t]here was no constitutional violation here." *Id.*

the admission was harmless under *Brecht* and Tenth Circuit precedent.  We affirm.

1. ***Legal Background***

In *Booth v. Maryland*, 482 U.S. 496 (1987), the Supreme Court held that introduction of a victim impact statement to a jury at the sentencing phase of a capital murder trial violated the Eighth Amendment.  *Id.* at 509.  In that case, the victim impact statement included two types of evidence.  The first type involved statements about the victim's "personal characteristics" and the emotional impact of the crime on the victim's family.  *Id.* at 503.  The second type of evidence involved the victim's family's opinions about the crime, the defendant, and the appropriate sentence.  *Id.* at 508; *Payne v. Tennessee*, 501 U.S. 808, 703 (1991).  *Booth* held that both types of evidence are "irrelevant to a capital sentencing decision" and "create[] a constitutionally unacceptable risk that the jury may impose the death penalty in an arbitrary and capricious manner." 482 U.S. at 502-03.

The Court revised its ruling four years later in *Payne v. Tennessee*, to allow victim testimony that includes the first type of evidence, description of the victim and the effects on the victim's family.  501 U.S. at 827.  The *Payne* Court held that there is no *per se* bar against such victim impact testimony under the Eighth Amendment.  *Id.*  The *Payne* Court specifically noted, however, that its holding did not affect *Booth*'s rule that "admission of a victim's family members' characterizations and opinions about the crime, the defendant, and the appropriate sentence violates the Eighth Amendment."  *Id.*

at 830 n.2.[9]

The Supreme Court has explained that sentencing decisions are properly based upon "the defendant's personal responsibility and moral guilt." *Booth*, 482 U.S. at 502 (quotations omitted). The danger that an improper victim impact statement poses to a defendant's Eighth Amendment rights is "that the jury may impose the death penalty in an arbitrary and capricious manner," by focusing on irrelevant factors such as "the degree to which the victim's family is willing and able to express its grief" or the perceived quality of the victim's character. *Id.* at 505-06.

The Tenth Circuit has clearly held on numerous occasions that *Booth* continues to prohibit victim impact statements that describe characteristics of the crime or request the death sentence. *E.g.*, *Hain*, 287 F.3d at 1238-39. In spite of this, Oklahoma law expressly authorizes the admission of victim impact testimony, including victims' characterization of the crime and opinions as to what sentence a defendant should receive, Okla. Stat. tit. 21, § 142A-1, and the OCCA has repeatedly allowed the practice, *see, e.g.*, *Ledbetter v. State*, 933 P.2d 880, 890-91 (Okla. Crim. App. 1997).

This court has found error in numerous OCCA opinions allowing prohibited victim impact statements in capital cases. *E.g. Selsor v. Workman*, 644 F.3d 984, 1026-

---

[9] The *Payne* Court also stated that the Fourteenth Amendment's Due Process Clause still prohibits testimony that is "so unduly prejudicial that it renders the trial fundamentally unfair." *Id*. at 825. In the courts below, Mr. Lockett challenged the victim impact statements on both Eighth Amendment and due process grounds. On appeal, he argues only the Eighth Amendment ground.

27 (10th Cir. 2011); *Hooper v. Mullin*, 314 F.3d 1162, 1174 (10th Cir. 2002); *Hain*, 287

F.3d at 1239.  The OCCA has acknowledged this Tenth Circuit case law but refuses to

follow it.  *See Coddington v. State*, 254 P.3d 684 (Okla. Crim. App. 2011).[10]

---

[10] Nine circuits and 38 states have addressed the admissibility of victim impact testimony.  With the lone exception of Oklahoma, our research shows that no jurisdiction permits the admission of victim impact testimony that includes opinions about the crime, the defendant, or the appropriate sentence.

All nine of the federal circuits that have considered this issue have concluded that *Booth*'s prohibition on this type of victim impact testimony survives *Payne*.  *See Williams v. Norris*, 612 F.3d 941, 951 (8th Cir. 2010); *United States v. Whitten*, 610 F.3d 168, 192 (2d Cir. 2010); *Fautenberry v. Mitchell*, 515 F.3d 614, 638 (6th Cir. 2008); *United States v. Corley*, 519 F.3d 716, 729 (7th Cir. 2008); *Welch v. Sirmons*, 451 F.3d 675, 702-03 (10th Cir. 2006); *United States v. Brown*, 441 F.3d 1330, 1351 (11th Cir. 2006); *Humphries v. Ozmint*, 397 F.3d 206, 217 (4th Cir. 2005); *Summerlin v. Stewart*, 341 F.3d 1082, 1112 n.15 (9th Cir. 2003), *rev'd on other grounds* by *Schriro v. Summerlin*, 542 U.S. 348 (2004); *United States v. Bernard*, 299 F.3d 467, 480 (5th Cir. 2002).

Twenty-two of the 33 death penalty states have explicitly recognized that *Booth*'s prohibition on victim statements containing opinions about the crime, the defendant, or the appropriate sentence remains the law.  Florida prohibits this type of victim statement through statute. Fla. Stat. § 921.141(7).  Twenty-one states have done so through judicial decisions.  *Ex parte McWilliams*, 640 So. 2d 1015, 1017 (Ala. 1993); *Lynn v. Reinstein*, 68 P.3d 412, 417 (Ariz. 2003); *Miller v. State*, 362 S.W.3d 264, 285 (Ark. 2010); *People v. Smith*, 68 P.3d 302, 330 (Cal. 2003); *Ortiz v. State*, 869 A.2d 285, 301-02 (Del. 2005); *Bryant v. State*, 708 S.E.2d 362, 381-82 (Ga. 2011); *State v. Payne*, 199 P.3d 123, 148 (Idaho 2008); *State v. Taylor*, 669 So. 2d 364, 370 (La. 1996); *Ware v. State*, 759 A.2d 764, 783 (Md. 2000); *Moffett v. State*, 49 So. 3d 1073, 1106-07 (Miss. 2010); *State v. Simmons*, 944 S.W.2d 165, 186-87 (Mo. 1997) (en banc); *State v. Bjorklund*, 604 N.W.2d 169, 214 (Neb. 2000); *Kaczmarek v. State*, 91 P.3d 16, 33-34 (Nev. 2004); *State v. Thompson*, 604 S.E.2d 850, 862 (N.C. 2004); *State v. Goodwin*, 703 N.E.2d 1251, 1262 (Ohio 1999); *State v. Guzek*, 86 P.3d 1106, 1109 n.3 (Or. 2004), *vacated on other grounds*, *Oregon v. Guzek*, 546 U.S. 517 (2006); *State v. Nesbit*, 978 S.W.2d 872, 888 n.8 (Tenn. 1998); *Simpson v. State*, 119 S.W.3d 262, 272 (Tex. Crim. App. 2003); *State v. Ott*, 247 P.3d 344, 351 (Utah 2010); *Juniper v. Commonwealth*, 626 S.E.2d 383, 420-21 (Va. 2006); *State v. Gregory*, 147 P.3d 1201, 1249-50 (Wash. 2006) (en banc).

An additional five states that no longer allow the death penalty have explicitly
Continued . . .

-31-

recognized that *Payne* did not overrule *Booth*'s prohibition on victim impact statements containing opinions about the crime, the defendant, or the appropriate sentence. *People v. Scott*, 594 N.E.2d 217, 248 (Ill. 1992); *State v. Muhammad*, 678 A.2d 164, 172 (N.J. 1996); *State v. Allen*, 994 P.2d 728, 750 (N.M. 1999); *State v. Tyler*, 565 S.E.2d 368, 377 n.11 (W. Va. 2002); *State v. Eggenberger*, 625 N.W.2d 360 at *7-9 & n.7 (Wis. Ct. App. 2001) (unpublished table).

Ten death penalty states have allowed victim impact evidence in some form, such as information about the victim's personal qualities or the impact of the crime on the victim's family—as authorized by *Payne*—without addressing the prohibited victim evidence at issue here. Three states have enacted statutes permitting victims to make statements of the type upheld in *Payne*. Colo. Rev. Stat. § 24-4.1-302.5(1)(g); N.H. Rev. Stat. Ann. § 21-M:8-k; 42 Pa. Cons. Stat. § 9711(a)(2). Six states have permitted *Payne*-approved victim impact evidence through judicial decisions. *Bivins v. State*, 642 N.E.2d 928, 956-57 (Ind. 1994); *State v. Kleypas*, 40 P.3d 139, 196-97 (Kan. 2001), *overruled on other grounds by Kansas v. Marsh*, 548 U.S. 163 (2006); *Kills on Top v. State*, 15 P.3d 422, 437 (Mont. 2000); *State v. Rocheville*, 425 S.E.2d 32, 36 (S.C. 1993); *State v. Rhines*, 548 N.W.2d 415, 445-47 (S.D. 1996); *Harlow v. State*, 70 P.3d 179, 193-96 (Wyo. 2003). We found no precedent indicating any of these states allows juries to hear the types of victim impact testimony prohibited under the surviving portions of *Booth*. Finally, Kentucky has a statute purporting to allow victims' families to make sentencing recommendations to the probation officer responsible for preparing the presentence report, Ky. Rev. Stat. § 421.520, but it does not appear Kentucky allows juries to hear such statements. Case law reveals only instances in which the commonwealth has allowed evidence explicitly permitted by *Payne*. *See, e.g.*, *Gray v. Commonwealth*, 203 S.W.3d 679, 689-90 (Ky. 2006) (upholding admission of evidence about victims' personal qualities and lives); *Bowling v. Commonwealth*, 942 S.W.2d 293, 303 (Ky. 1997), *overruled on other grounds by McQueen v. Commonwealth*, 339 S.W.3d 441 (Ky. 2011) (upholding admission of "humanizing" evidence about victims' lives and personal qualities).

Oklahoma stands alone in permitting juries to hear victim impact statements that "contain characterizations of the crime and opinion of the appropriate punishment" and in concluding that *Booth*'s prohibition against such evidence "was overruled by *Payne*." *Lockett v. State*, 53 P.3d 418, 427 (Okla. Crim. App. 2002); *see also, e.g.*, *Dodd v. State*, 100 P.3d 1017, 1046 (Okla. Crim. App. 2004).

2. ***The Victim Impact Statement Violated Clearly Established Law But Did Not Have a Substantial and Injurious Effect on the Jury's Decision***

We are convinced that some portions of the victim impact statement were unconstitutional, but our careful review of the record indicates that this unconstitutional evidence did not have a substantial and injurious effect on the jury's sentencing decision. In the following analysis, we first address Mr. Lockett's claim that the victim impact evidence violated his Eighth Amendment rights and then turn to whether the violation satisfies *Brecht*'s harmless error standard.

a. ***Constitutional Violation***

In determining whether the challenged portions of the statement were unconstitutional, we apply AEDPA deference. We reject the OCCA's conclusion only if it is "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d).

The OCCA explicitly relied on an incorrect statement of the law when it stated that "[v]ictim impact testimony may include . . . circumstances surrounding the crime, the manner in which the crime was perpetrated, and the victim's opinion of a recommended sentence." *Lockett*, 53 P.3d at 427 (quotations omitted). The OCCA also assumed that *Payne* overruled *Booth* in its entirety. *Id.* This is contrary to the Supreme Court's plain statement that *Payne* did not affect *Booth*'s Eighth Amendment prohibition on "victim's family members' characterizations and opinions about the crime, the defendant, and the appropriate sentence." *Payne*, 501 U.S. at 830 n.2; *see also DeRosa v. Workman*, 679

F.3d 1196, 1237 (10th Cir. 2012) ("[I]t remains constitutionally improper for the family members of a victim to provide characterizations and opinions about the crime, the defendant, and the appropriate sentence." (quotations omitted)); *Selsor v. Workman*, 644 F.3d 984, 1026-27 (10th Cir. 2011) ("The Supreme Court's decision in *Payne* and our own post-*Payne* cases clearly establish that it is a violation of the Eighth Amendment to allow a victim or a victim's family member to comment, during second-stage proceedings, on the appropriate sentence for a capital defendant.").

The victim impact statement in this case involved two types of evidence prohibited by the Eighth Amendment: characterization of the crime and the defendant and a sentencing recommendation. The Neimans' statement described portions of the crime, including Mr. Lockett's beating of Ms. Neiman with the shotgun, his successful attempt to take her truck, and his taping her hands and mouth so "she cannot scream or yell at them anymore." Tr. Vol. XIII at 2318. The statement speculated about Ms. Neiman's thoughts and feelings during the crime, telling the jury that her refusal to cooperate with Mr. Lockett was based on her moral code and attributing motives to Mr. Lockett. *Id.* at 2318 ("Stephanie is going to stand up for her rights no matter what. . . . Right is right and wrong is wrong. Maybe that's what Clayton was so scared of."). The Neimans' statement ended with an unambiguous plea to the jury to sentence Mr. Lockett to death. *Id.* at 2324.

In short, the admission of portions of the Neimans' victim impact statement was unconstitutional in light of clearly established Supreme Court law.

-34-

b. ***Harmless Error***

We now consider "whether the erroneous admission of victim impact testimony so clearly swayed the jury as to cause [Mr. Lockett] actual prejudice." *Welch v. Workman*, 639 F.3d 980, 1002 (10th Cir. 2011).[11]  Our harmless error analysis is governed by *Brecht*'s "substantial and injurious effect" standard.  *See Fry*, 551 U.S. at 121-22.  Thus, the error is reversible only if we find ourselves "in grave doubt" about whether the victim impact testimony affected the jury's verdict.  *See Bland*, 459 F.3d 999, 1009 (10th Cir. 2006) (quotations omitted).

Because the OCCA erred in finding no Eighth Amendment violation, we grant no deference to its harmless error analysis and consider the question de novo.  *See Welch v. Sirmons*, 451 F.3d 675, 703-04 (10th Cir. 2006), *overruled on other grounds by Wilson v. Workman*, 577 F.3d 1284 (10th Cir. 2009).

To determine whether the Neimans' statement had a substantial and injurious effect on the jury's decision, we must consider it in the overall context of the trial and the "record as a whole." *Brecht*, 507 U.S. at 638.  We first examine the statement itself and then address the broader context of mitigating and aggravating evidence presented at trial.  We find guidance for our analysis in Tenth Circuit precedent addressing harmless error with respect to unconstitutional victim impact statements.

---

[11] This opinion discusses two cases involving a defendant with the last name Welch:  *Welch v. Workman*, 639 F.3d 980 (10th Cir. 2011), and *Welch v. Sirmons*, 451 F.3d 675 (10th Cir. 2006).  To avoid confusion, we use the full name of these cases in every instance.

i. ***The Victim Impact Statement***

The federal district court described the challenged portions of the statement as "noticeably more pallid[] than might have been expected" and "not nearly as inflammatory as they, under the facts of this case, could have been." *Lockett*, No. CIV-03-734-F at 43. The most emotional and expressive part of the Neimans' statement was constitutionally permissible: statements about the effect the murder had on them as a family, about their daughter's unique and positive qualities, and about how much they missed her.

We agree that the statement was relatively pallid in comparison to other victim impact statements this circuit has found harmless. For example, this case involved a single victim impact statement read to the jury by an extended family member, and not by the Neimans themselves. In contrast, *Welch v. Sirmons* involved unconstitutional victim impact statements from five separate family members. 451 F.3d at 710. Similarly, *DeRosa v. Workman* involved multiple unconstitutional victim impact statements. 679 F.3d at 1238. In both cases, we found the inclusion of the unconstitutional evidence to be harmless under *Brecht*.

In the Neimans' statement, the description of the crime was brief and devoid of colorful or inflammatory language. It did not relay any facts that had not already been clearly established by the evidence. In contrast, *Welch v. Workman* involved unconstitutional victim impact statements from three family members that described the crimes in vivid and emotional detail. For example, the victim's father told the jury that

the defendant "chased my son down and . . . butchered him with a knife." 639 F.3d at 997. The victim's mother testified that "there is no doubt that they're the ones who killed him. They planned it." *Id.* at 999.

The Neimans' statement also did not include any characterization of Mr. Lockett. The statements that were held to be harmless in *Welch v. Workman* described the defendant in highly emotional terms. The victim's mother told the jury the defendant "sits in this courtroom, smug and uncaring" and never "show[ing] one sign of remorse. No shame." *Id.* Multiple statements described the defendant as a "murderous animal" and a "parasite." *Id.* at 990, 999.

The Neimans' request for the death penalty was a single, concise sentence. In contrast, the three victim statements that were held to be harmless in *Welch v. Workman* contained extremely emotional pleas for the death penalty. The family members in that case "implored" and "begged" the jury to sentence the defendant to death. *Id.* at 990, 1000. The victim's father told the jury his request was on behalf of his "grandsons, Robert and James, who are not old enough to speak for themselves," and who would grow up without their father. *Id.* at 997. The victim's mother asked the jury to disregard the mitigating evidence, criticized the defense counsel for suggesting the defendant's childhood circumstances warranted mercy, and stated that her own childhood was also difficult but that this did not give anyone "the right to brutally attack another human being." *Id.* at 999.

Finally, as in *Welch v. Workman*, Mr. Lockett's jury was correctly instructed that

its decision about whether to sentence the defendant to death was "limited to a moral inquiry into the culpability of the defendant, not an emotional response to the evidence." *Lockett*, No. CIV-03-734-F at 43.  *See Welch v. Workman*, 639 F.3d at 1004.

ii.    ***Context of All Mitigating and Aggravating Evidence***

In evaluating whether the unconstitutional portions of the Neimans' statement had a substantial and injurious effect on the jury, we must consider it in the context of all of the aggravating and mitigating evidence.

First, the evidence of aggravating circumstances was substantial.  During the guilt phase, the jury heard Mr. Lockett's confession, in which he described his brutal crimes in unemotional terms and without expressing remorse, as well as emotional testimony from two surviving victims.  During the penalty phase, the jury heard from seven State witnesses.  Two witnesses described Mr. Lockett's past criminal and violent behavior. Five correctional officers testified that during his time in jail, Mr. Lockett had been repeatedly found with contraband weapons and had threatened guards.  Moreover, the jury heard evidence that Mr. Lockett had threatened the safety of both surviving victims—individuals whom jurors knew from earlier guilt phase testimony—in retaliation for their cooperation with authorities.

After hearing all aggravating and mitigating evidence from both sides, the jury found the presence of five aggravating circumstances beyond a reasonable doubt.

In *Welch v. Workman*, we held that overwhelming evidence of guilt, testimony about the brutality of the crime, and the jury's finding of three aggravating circumstances

-38-

clearly outweighed any potential impact of unconstitutional victim impact testimony. 639 F.3d at 1004. We emphasized that, as here, the jury was correctly instructed on the role of mitigating evidence in its sentencing decision. *Id.* We explained:

> The family members' testimony violated every category of impermissible expression. . . . But "[t]he principle that collateral review is different from direct review resounds throughout our habeas jurisprudence." *Brecht*, 507 U.S. at 633. Considering all of the evidence in both stages of this trial . . . . [w]e cannot conclude that the jury's verdict was substantially influenced by the victim impact testimony. *See Brecht*, 328 U.S. at 776.

*Id.* at 1003-04.

Given our precedent in cases like *Welch v. Workman*, which involved more extensive unconstitutional victim impact testimony and fewer aggravating circumstances, we cannot conclude that the erroneously admitted victim impact testimony in this case was prejudicial.

Remembering that "an error that may justify reversal on direct appeal will not necessarily support a collateral attack on a final judgment," *Brecht*, 507 U.S. at 634, we affirm the district court's finding that this error was harmless.

## C. *Admission of Dr. Call's Rebuttal Evidence*

Mr. Lockett argues that the trial court erred by allowing Dr. Call to testify because his examination of Mr. Lockett exceeded the scope agreed to by Mr. Lockett's counsel

and therefore violated his Sixth Amendment rights.[12] The OCCA found that the record

did not support the factual contention that Dr. Call's interview exceeded the agreed

scope. It further found no constitutional error and held alternatively that any error was

harmless. The federal district court echoed these conclusions. We affirm the federal

district court's determination that the trial court's admission of Dr. Call's testimony

survives AEDPA deference. We do not reach the harmless error question.

1. *Legal Background*

The Sixth Amendment requires that a defendant be afforded the right to effective

assistance of counsel in determining whether to submit to an interview or examination

with a State expert. *See Estelle v. Smith*, 451 U.S. 454, 470-71 (1981). The Supreme

Court has held that defense counsel must be given advance notice of the scope and

substance of the expert examination. *See id.; Buchanan v. Kentucky*, 483 U.S. 402, 424

(1987).

In *Estelle*, the Supreme Court rejected the prosecution's use of psychiatric

testimony regarding the defendant's future dangerousness during the penalty phase

because the expert drew his opinion from a court-ordered competency examination. 451

U.S. at 456-60. The Court determined this violated the defendant's Fifth and Sixth

Amendment rights because statements during the examination were made without the

benefit of counsel and because the defendant's counsel did not have advance notice of the

---

[12] Mr. Lockett argued both Fifth and Sixth Amendment grounds in his original
habeas petition, but only the Sixth Amendment argument is at issue in this appeal.

scope and substance of the examination. *Id.* at 467-71. The *Estelle* Court emphasized that the psychiatric testimony was based on a court-ordered competency examination that the defendant did not request and that the defendant did not put his mental health at issue. 451 U.S. at 466, 468.

Several years after *Estelle*, the Supreme Court issued its opinion in *Buchanan*, which clarified that the prosecution retains the right to rebut psychological evidence presented by the defendant. 483 U.S. at 422-23. In *Buchanan*, the defense counsel joined a prosecution motion requesting a psychiatric examination by a state expert pursuant to a state law governing involuntary hospitalization. *Id.* at 410-11. The state psychiatric expert conducted the interview and prepared a psychological evaluation. *Id.* at 408-10. At trial, the defendant presented an affirmative defense of extreme emotional disturbance and called his own mental health expert to support the defense. *Id.* at 408. The prosecutor responded with rebuttal evidence from the state psychiatric expert's report. *Id.* at 410.

The *Buchanan* Court held that admitting this evidence was constitutional. *Id.* at 422. It distinguished *Estelle*, explaining that *Estelle* involved "distinct circumstances"—in particular, that the defendant had not requested the examination or put his mental health at issue. *Id.* The Court explained that, "if a defendant requests such an evaluation or presents psychiatric evidence, then, at the very least, the prosecution may rebut this presentation with evidence from the reports of the examination that the defendant requested." *Id.* at 422-23. Moreover, the Court specifically held that the defendant's

-41-

Sixth Amendment rights were not implicated because the defendant's counsel requested the examination and was therefore on notice that the psychological evidence could be used by the prosecution in rebuttal. *Id.* at 424-25.

## 2. *Admission of Dr. Call's Rebuttal Testimony Was Not Unreasonable*

We conclude that the OCCA's holding that the admission of Dr. Call's rebuttal testimony did not violate Mr. Lockett's Sixth Amendment rights was based on a reasonable application of *Estelle* and *Buchanan* and a reasonable determination of the facts.

The OCCA reasonably concluded that *Estelle*'s restrictions do not apply to Dr. Call's testimony because this case does not meet the "distinct circumstances" on which *Estelle* was based. *Buchanan*, 483 U.S. at 422. For example, unlike Mr. Estelle, Mr. Lockett requested the psychiatric interview and put his own mental health at issue during the penalty phase.

The OCCA reasonably applied *Buchanan* when it concluded that Mr. Lockett put his mental health at issue. Mr. Lockett presented psychological evidence in the penalty phase of trial, including Dr. Smith's testimony that he was mentally ill because his childhood trauma affected his brain development and his ability to relate with others. Dr. Smith also testified that Mr. Lockett's mental health issues could be effectively treated and that Mr. Lockett had the capacity for empathy and kindness.

Applying *Buchanan*, the OCCA held that because Dr. Smith's testimony placed Mr. Lockett's mental health at issue, the State was therefore entitled to rebut with its own

mental health expert. Dr. Call offered this rebuttal by testifying that in his expert opinion Mr. Lockett was not mentally ill, was a psychopath, and did not have genuine empathy for others. He further testified that Mr. Lockett could likely not be effectively treated. As our previous summary of *Buchanan* illustrates, this application was not unreasonable.

Finally, the OCCA's conclusions were not based on an unreasonable determination of the facts. Mr. Lockett's counsel originally agreed to allow the interview for the purpose of determining whether Mr. Lockett was insane at the time of the crimes. Dr. Call testified that the interview was brief (one-and-a-half to two hours) and that Mr. Lockett was uncooperative. Mr. Lockett now alleges that the interview exceeded the agreed scope of evaluating his sanity at the time of the crimes. He does not offer evidence about the interview itself, such as questions Dr. Call asked or statements Mr. Lockett made. Instead, he reasons that, because Dr. Call later formed an opinion about something outside the interview's agreed scope, the interview itself must have exceeded that scope.

The OCCA made two factual findings concerning this issue. First, it rejected Mr. Lockett's assertion that the interview exceeded its agreed scope. This finding is not unreasonable. Dr. Call testified that he relied on many sources to form his opinions, including interviews with other witnesses, reports, and Mr. Lockett's videotaped confession. It is reasonable to conclude from the record that Dr. Call limited his interview to the insanity question and then later used information gleaned from numerous sources (including the limited interview) to form an opinion about a different question:

-43-

Mr. Lockett's mental health at the time of the trial.

In its second fact finding with respect to Dr. Call's testimony, the OCCA concluded that the interview did not significantly influence Dr. Call's opinion testimony regarding Mr. Lockett's mental health. Mr. Lockett argues that this conclusion is contrary to the record. We do not review this finding, however, as it is only relevant to a harmless error analysis. Because we accept as reasonable the OCCA's finding that the interview was not improper, we need not address harmlessness.

In short, we conclude that the OCCA's holding on this issue was based on a reasonable application of *Estelle* and *Buchanan* and on a reasonable determination of the facts in light of the evidence presented. We therefore affirm.

### D. *Sufficiency of Evidence for the Great Risk Aggravator*

Mr. Lockett argues that the evidence was insufficient to support the jury's finding with respect to one of the five aggravating circumstances: that he created a great risk of death to more than one person. The OCCA held that the evidence was sufficient under Supreme Court precedent and its own precedent. The federal district court agreed, and we affirm.

### 1. *Legal Background*

To support a sentence of death, a jury must find the presence of at least one aggravating circumstance beyond a reasonable doubt. *See Romano v. Gibson*, 278 F.3d 1145, 1154 (10th Cir. 2002). When reviewing the sufficiency of the evidence to support the finding of an aggravating circumstance, we follow the standard articulated in *Jackson*

-44-

*v. Virginia*, 443 U.S. 307 (1979).

In *Jackson*, the Supreme Court held that in reviewing a defendant's collateral appeal of the sufficiency of the evidence, a federal court considers whether, "after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." 443 U.S. at 319. In *Lewis v. Jeffers*, 497 U.S. 764 (1990), the Court clarified that "[t]hese considerations apply with equal force to federal habeas review of a state court's finding of aggravating circumstances." *Id.* at 782.

"Like findings of fact, state court findings of aggravating circumstances often require a sentencer to 'resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts.'" *Id*. (quoting *Jackson*, 443 U.S. at 319). "We must accept the jury's determination as long as it is within the bounds of reason. Our review is even more limited given that AEDPA governs this issue." *Boltz v. Mullin*, 415 F.3d 1215, 1232 (10th Cir. 2005).

On direct appeal, the OCCA also looked to its own precedent to review this issue. The OCCA's case law provides that evidence is sufficient to support a great risk of death to others if, reading the evidence in light most favorable to the State, the State shows that the defendant created a great risk of death "in close proximity in terms of time, location, and intent to the killing," *Lockett*, 53 P.3d at 430 (citing *Thornburg v. State*, 985 P.2d 1234, 1248 (Okla. Crim. App. 1999)), or "threaten[ed] the life of another and ha[d] the apparent ability and means of taking that person's life," *Smith v. State*, 727 P.2d 1366,

1373 (Okla. Crim. App. 1986).

Mr. Lockett's arguments rely on another OCCA case, *Valdez v. State*, 900 P.2d 363 (Okla. Crim. App. 1995). In *Valdez*, the OCCA found the evidence was insufficient to support a jury's finding of the great risk aggravator where the defendant had killed the victim in front of a friend, then threatened to kill the friend if he reported the crime. *Id.* at 382. The OCCA decided that the friend in *Valdez* was not genuinely at risk because he knew the defendant well and was never the target of the defendant's anger. *Id.* at 384. It also noted that it had rarely found sufficient evidence for the great risk aggravator when the person allegedly at risk was not physically injured. *Id.* at 383 n.97.

This court considered a challenge to an Oklahoma jury's finding of the great risk aggravator in *Ross v. Ward*, 165 F.3d 793 (10th Cir. 1999). In that case, the defendant robbed a motel. *Id.* at 795. He threatened and physically assaulted the night clerk, who survived. *Id.* Although the night clerk did not see a weapon, the defendant told her he would kill her if she did not cooperate. *Id.* at 801. As he left the motel, the defendant fatally shot a police officer. *Id.* at 795. We upheld the jury's finding that the defendant had created a great risk of death to more than one person because the night clerk was at risk of death "in close proximity to the killing itself in terms of time, location, and intent." *Id.* at 801.

2. ***The Jury's Finding Was Supported by Sufficient Evidence***

We agree with the federal district court that the OCCA's conclusion was reasonable under the *Jackson* standard.

-46-

Mr. Lockett argues that the OCCA and the federal district court failed to consider all of the relevant facts and therefore the OCCA's ultimate fact conclusions on this issue were unreasonable. He points to several facts that he believes demonstrate that Mr. Bornt and Ms. Hair were not at great risk of death. For example, the surviving victims testified at trial that at some points during their ordeal they believed they would survive, their hands and feet were untaped at the murder site, and only a single grave was dug. Although Mr. Lockett acknowledges that he threatened to kill Mr. Bornt and Ms. Hair, he insists that his threats were not temporally close to Ms. Neiman's murder.

Mr. Lockett further argues that the federal district court erred in distinguishing *Valdez*. He reads *Valdez* to say that, in Oklahoma, a threat of death, even coupled with physical assault, is insufficient to create a *great* risk of death.

Under the *Jackson* standard, we "must accept the jury's determination as long as it is within the bounds of reason." *Boltz*, 415 F.3d at 1232. The jury heard evidence that would allow it to conclude beyond a reasonable doubt that several victims other than Ms. Neiman were at great risk of death, including Ms. Hair, Mr. Bornt, and Mr. Bornt's infant son. It heard that Mr. Lockett and his co-assailants forcibly entered Mr. Bornt's house carrying weapons, and that Mr. Lockett repeatedly threatened the surviving adult victims, physically assaulted them, planned to kill them, and allowed them to live only after they promised not to report the crimes. The jury heard that the one victim who resisted Mr. Lockett, Ms. Neiman, was killed. Ms. Hair testified that she was repeatedly sexually assaulted by three intruders. Mr. Bornt testified that Mr. Lockett directed the actions of

-47-

the others and apparently controlled the decision whether to kill them.

The facts Mr. Lockett points to, considered in context, do not indicate that the surviving victims were somehow safe. For example, Ms. Hair's testimony that she did not expect to be killed does not suggest that she was not at great risk of being killed—to the contrary, her testimony was that she "had faith" that both she and Ms. Neiman would survive. Tr. X at 1687. At the murder site, Mr. Lockett used a knife to remove the tape from Ms. Hair's hands immediately before sexually assaulting her. And after being untaped, Ms. Hair and Mr. Bornt were kept in close proximity to their armed kidnappers while the kidnappers planned and executed Ms. Neiman's murder.

In *Ross*, we found evidence sufficient to support the great risk aggravator under *Jackson* in circumstances that were arguably less dangerous than the facts in the present case. For example, the hotel clerk in *Ross* was placed in danger for a relatively short time, whereas Mr. Lockett's victims were in danger for many hours. And the clerk was not assaulted or kidnapped, as Mr. Lockett's victims were.

As the federal district court noted, *Valdez* is easily distinguishable. Unlike the friend in that case, Mr. Bornt and Ms. Hair were physically assaulted, bound with duct tape, held against their will, and kidnapped. Mr. Lockett's confession establishes that they were taken to the country to be killed. Unlike in *Valdez*, Ms. Hair was repeatedly sexually assaulted. Also unlike in *Valdez*, Mr. Lockett made the same threats to three adult victims and carried out that threat with the one victim who did not cooperate. Moreover, the OCCA is in the best position to determine the meaning of its own

precedent, and it has clearly explained that *Valdez* is not so broad as to extend to the facts of this case.

The fact that only one person was murdered on that day does not make it unreasonable for a jury to conclude that Mr. Lockett's actions caused a great risk of death to other victims. The jury's finding that Mr. Lockett created a great risk of death to more than one person was "within the bounds of reason." *Boltz*, 415 F.3d at 1232.

We therefore affirm the OCCA's holding on this issue.

### E. *Cumulative Error*

Mr. Lockett argues that the cumulative effect of the penalty phase errors—the erroneous restriction of Ms. Turner's testimony and the admission of unconstitutional victim impact evidence—was prejudicial and demands reversal. The OCCA and the federal district court concluded that the cumulative effect of the errors was harmless. We affirm.

### 1. *Legal Background*

"[T]he cumulative effect of two or more individually harmless errors has the potential to prejudice a defendant to the same extent as a single reversible error." *United States v. Rivera*, 900 F.2d 1462, 1469 (10th Cir. 1990). We must aggregate all errors and ask whether collectively they can no longer be determined to be harmless. *Id.* at 1470. The cumulative effect of the errors will be deemed harmful if they "so infected the trial with unfairness as to make the resulting conviction a denial of due process, or rendered the sentencing fundamentally unfair in light of the heightened degree of reliability

-49-

demanded in a capital case." *Wilson v. Sirmons*, 536 F.3d 1064, 1122 (10th Cir. 2008) (quotations omitted).

Mr. Lockett raised this claim on direct appeal, and the OCCA considered its merits. Even so, AEDPA deference does not apply because the OCCA failed to consider all of the constitutional errors present in the case. *Welch v. Sirmons*, 451 F.3d at 710. We therefore review this issue de novo, applying the *Brecht* "substantial and injurious effect" standard. *See id.*

2. *Analysis*

We conclude that the cumulative effect of the errors in the penalty phase of Mr. Lockett's trial was not prejudicial.

The trial court made two constitutional errors during the penalty phase—the exclusion of Ms. Turner's mitigating testimony and the introduction of the victim impact statement. Mr. Lockett urges that the cumulative effect of these errors simultaneously undercut his mitigation case while artificially bolstering the State's aggravation case. He insists that this should leave us in grave doubt as to whether the errors caused at least one juror to choose death over life. *See Moore*, 153 F.3d at 1110.

As we have discussed, each error was harmless by itself. Although the jury was unable to hear Ms. Turner's complete testimony, it nevertheless heard similar expert opinion from Dr. Smith; it also heard many facts about Mr. Lockett's childhood from Dr. Smith and from Mr. Lockett's family members that were similar to the few facts it missed hearing from Ms. Turner. And although the victim impact statement included an

-50-

unconstitutional sentence recommendation and description of the crimes, these portions of the statement were brief and less inflammatory than victim impact testimony we have found to be harmless in the past, *see, e.g.*, *Welch v. Workman*, 639 F.3d at 998-999. Moreover, the victim impact statement was arguably less inflammatory or shocking than other evidence the jury heard, including Mr. Lockett's emotionless confession, the emotional testimony of the surviving victims, and the evidence that Mr. Lockett had threatened to harm his surviving victims in retaliation for their testimony.

We cannot conclude that the combined effect of these two errors had a substantial and injurious effect on the jury's verdict. Nor do we believe they "so infected the trial with unfairness as to make the resulting conviction a denial of due process, or rendered the sentencing fundamentally unfair in light of the heightened degree of reliability demanded in a capital case." *Wilson*, 536 F.3d at 1122. The jury heard extensive evidence of both mitigating and aggravating factors, and it found the presence of five aggravating circumstances beyond a reasonable doubt. Any effect these combined errors may have had on the jury's deliberations could not have been significant enough to "infect the trial with unfairness" or deny Mr. Lockett due process of law. *Id.*

For these reasons, we affirm the district court's conclusion that reversal is not warranted on Mr. Lockett's cumulative error claim.

## F. *Ineffective Assistance of Counsel at the Guilt Phase*

Mr. Lockett argues that he received ineffective assistance of counsel during the guilt phase of his trial because his counsel effectively conceded his guilt. He also argues

that he is entitled to an evidentiary hearing to demonstrate that his counsel did not discuss the guilt-concession strategy with him before trial.[13] The OCCA and the federal district court concluded that Mr. Lockett's counsel's performance was not defective and alternatively that Mr. Lockett did not suffer prejudice from his counsel's performance. Both courts denied the evidentiary hearing request. We affirm.

1. *Legal Background*

The parties disagree about which of two legal standards of review applies to Mr. Lockett's claim of ineffective assistance of counsel. One standard is the familiar *Strickland v. Washington*, 466 U.S. 668 (1984), standard. Under *Strickland*, a defendant is entitled to relief if (1) counsel's performance was deficient, and (2) the defendant was prejudiced by it. *Id.* at 687-88. A defendant establishes the first *Strickland* requirement by showing counsel's performance "fell below an objective standard of reasonableness." *Id.* To meet this requirement, the defendant must overcome a "strong presumption that counsel's conduct [fell] within the wide range of reasonable professional assistance . . . [and] might be considered sound trial strategy." *Id.* at 689 (quotations omitted). A defendant establishes the second requirement by showing "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694.

---

[13] Mr. Lockett raised three separate claims of ineffective assistance of counsel in the district court, but the court granted a COA on only this issue regarding the alleged guilt-phase concession.

The other standard at issue is from *United States v. Cronic*, 466 U.S. 648 (1984). Under *Cronic*, a defendant is entitled to a presumption of prejudice if defense counsel failed "to subject the prosecution's case to meaningful adversarial testing." *Id.* at 658-89. The Supreme Court has emphasized the narrow scope of *Cronic*, however. For *Cronic*'s presumption of prejudice to apply, "the attorney's failure must be complete." *Bell v. Cone*, 535 U.S. 685, 696-97 (2002). The Tenth Circuit has applied *Cronic* only where the evidence "overwhelmingly established that [the] attorney abandoned the required duty of loyalty to his client . . . apparently with the intention to weaken his client's case." *Turrentine v. Mullin*, 390 F.3d 1181, 1208 (10th Cir. 2004) (quotations omitted).

In *Florida v. Nixon*, 543 U.S. 175 (2004), the Supreme Court held that a concession of guilt in the first stage of a death penalty case may be a reasonable trial strategy when evidence of guilt is overwhelming. *Id.* at 190-92. The Court specifically held that such a course should be gauged under *Strickland*, not *Cronic*. *Id.* Moreover, the *Nixon* Court held that defense counsel is not obligated to obtain a defendant's express consent before pursuing this strategy. *See id.* at 187-89. Mr. Lockett nevertheless argues that *Cronic* should apply because his counsel failed even to discuss the guilt-concession strategy with him, much less obtain his express consent. *Nixon* is silent as to whether defense counsel is constitutionally obligated to notify a defendant before conceding guilt.

Mr. Lockett raised this claim on direct appeal, and the OCCA considered the merits of the claim. Therefore, AEDPA deference applies, and Mr. Lockett is entitled to relief only if he shows that the OCCA's decision is "contrary to" or "an unreasonable

-53-

application of" clearly established Supreme Court law or is otherwise "based on an unreasonable determination of the facts." 28 U.S.C. § 2254(d).

## 2. *Mr. Lockett Has Not Demonstrated Ineffective Assistance Under* **Strickland**

We conclude that the OCCA's decision to apply *Strickland* rather than *Cronic* was not contrary to, or an unreasonable application of, clearly established Supreme Court law. We further conclude that Mr. Lockett cannot overcome AEDPA deference with respect to the OCCA's *Strickland* analysis. We also affirm the federal court's denial of Mr. Lockett's request for an evidentiary hearing.[14]

### a. *Decision to apply* **Strickland** *rather than* **Cronic**

The OCCA's decision to apply *Strickland* rather than *Cronic* was reasonable and therefore survives ADEPA deference.

In *Cronic*, the Supreme Court explained that a presumption of prejudice arises when defense counsel entirely fails to subject the prosecution's case to meaningful

---

[14] To receive an evidentiary hearing in a collateral appeal, Mr. Lockett must show that "the facts underlying the claim would be sufficient to establish by clear and convincing evidence that but for constitutional error, no reasonable fact finder would have found [him] guilty of the underlying offense," *and* that his claim relies on either (1) "a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court, that was previously unavailable," and (2) "a factual predicate that could not have been previously discovered through the exercise of due diligence." 28 U.S.C. § 2254(e)(2).

The record is silent as to whether trial counsel provided Mr. Lockett with notice of his strategy, and Mr. Lockett argues that an evidentiary hearing will show that his counsel failed to give notice. However, as our analysis demonstrates, this fact would not be sufficient to meet the requirements of § 2254(e)(2) or to show that the OCCA's application of *Strickland* was unreasonable.

adversarial testing. 466 U.S. at 659. Notably, the Court did _not_ find that the circumstances in _Cronic_ itself—a young, inexperienced real estate attorney appointed 25 days before trial to represent a criminal defendant charged with mail fraud—qualified for this presumption. The Court pointed to only one example of a case that would justify a presumption of prejudice without inquiring into counsel's actual performance at trial: _Powell v. Alabama_, 287 U.S. 45 (1932), where an out-of-state attorney was appointed to represent multiple young, illiterate defendants on the day of their trial for a highly publicized "atrocious crime regarded with especial horror in the community." _Cronic_, 466 U.S. at 660 (quoting _Powell_, 287 U.S. at 57-58).

Since that time, the Supreme Court and this court have emphasized the narrow application of _Cronic_. In _Bell_, for example, the Court explained that _Cronic_ applies to the narrow circumstances in which counsel fails to oppose the prosecution throughout an entire proceeding. 535 U.S. at 696-97 ("When we spoke in _Cronic_ of the possibility of presuming prejudice . . . we indicated that the attorney's failure must be _complete_." (emphasis added)); _Turrentine_, 390 F.3d at 1208 ("This court has repeatedly found the _Cronic_ presumption inapplicable where counsel actively participated in all phases of the trial proceedings." (quotations omitted)).

The OCCA found that Mr. Lockett's trial counsel participated in every aspect of the trial, made objections, and conducted cross-examinations. Mr. Lockett does not dispute these findings, but he argues that trial counsel effectively conceded guilt and thus completely failed to subject the prosecution's case to meaningful adversarial proceedings.

-55-

But Mr. Lockett does not point to any Supreme Court holding on point.  To the contrary, the case that appears to be most on point, *Nixon*, suggests that the *Strickland* standard applies.  *Nixon*, 543 U.S. at 190-91.  *Nixon* held that defense counsel's concession of guilt without a defendant's express consent does not necessarily render counsel ineffective.  *Id.* at 187-89.  And the *Nixon* Court applied *Strickland* in concluding that counsel's strategy was not deficient.  *Id.* at 190-92.

Finally, Mr. Lockett's attempts to distinguish *Nixon* do not succeed.  He argues that *Nixon*'s holding that *Strickland* applies to a counsel's decision to concede guilt at the trial phase should not apply to his case because *Nixon* involved counsel's failure to obtain a client's explicit approval, whereas he alleges here that his trial counsel failed even to *notify* him of the concession strategy.  But under AEDPA deference, we cannot overturn the OCCA's holding unless it is conflicts with "clearly established" federal law as determined by the Supreme Court.  28 U.S.C. § 2254(d).  Mr. Lockett does not point to any such clearly established federal law that limits *Nixon*'s holding in this way.

The OCCA's decision to apply *Strickland* therefore survives AEDPA deference.

b.  *Application of the* **Strickland** *standard*

Having determined that the OCCA's decision to apply *Strickland* was reasonable, we review its analysis under the considerable deference required by *Strickland* itself—in addition to AEDPA deference.  Mr. Lockett does not attempt to argue that his claim succeeds under *Strickland*.

The OCCA concluded that Mr. Lockett's trial counsel was not deficient, and the

-56-

federal district court agreed.  Both courts noted that the evidence of Mr. Lockett's guilt was overwhelming.  The jury saw Mr. Lockett's videotaped confession, in which he gave a detailed description of his crimes.  Two surviving victims testified and identified him. Nothing in the record suggests there were weaknesses or inconsistencies in the victims' testimony that could have been exploited.  As the Supreme Court explained in *Nixon*:

> [T]he gravity of the potential sentence in a capital trial . . . vitally affect[s] counsel's strategic calculus[, and] when the evidence is overwhelming and the crime heinous . . . avoiding execution [may be] the best and only realistic result possible. . . . [C]ounsel cannot be deemed ineffective for attempting to impress the jury with his candor and his unwillingness to engage in a useless charade.

*Nixon*, 543 U.S. at 190-92 (quotations and citations omitted).

In light of *Nixon*, it was reasonable for the OCCA to conclude that Mr. Lockett's trial counsel's performance was not deficient, but rather strategic.  Mr. Lockett therefore failed to establish the first *Strickland* factor, which is fatal to a *Strickland* claim.  The second *Strickland* factor—whether there is a reasonable likelihood that the jury's verdict would have been different but for counsel's deficient performance—is irrelevant because counsel was not deficient.

We therefore affirm the federal district court's holding that the OCCA's rejection of Mr. Lockett's claim of ineffective assistance of counsel was reasonable.  Because we uphold the OCCA's resolution of the claim under AEDPA deference regardless of whether counsel notified Mr. Lockett of the guilt-concession strategy, we deny Mr. Lockett's request for an evidentiary hearing.

## IV. **MOTION TO EXPAND THE COA**

In addition to the seven issues on which the federal district court granted a COA, Mr. Lockett asks this court to grant a COA on three more issues. We first review the standard for determining whether a COA may be granted. We then address each of the three issues and conclude that COA should be denied in each instance.

As we previously noted, Mr. Lockett may not appeal the federal district court's decision without a COA. *Miller-El*, 537 U.S. at 335-36; *Clark v. Oklahoma*, 468 F.3d 711, 713 (10th Cir. 2006). We may issue a COA "only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). This standard requires Mr. Lockett to demonstrate "that reasonable jurists could debate whether . . . the petition should have been resolved in a different manner or that the issues presented were adequate to deserve encouragement to proceed further." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000) (quotations omitted).

The OCCA addressed the three issues Mr. Lockett proposes for COA. Thus, in deciding whether Mr. Lockett meets the requisite standard, "AEDPA's deferential treatment of state court decisions must be incorporated into our consideration of his request for COA." *Charlton v. Franklin*, 503 F.3d 1112, 1115 (10th Cir. 2007) (quotations omitted). As we previously explained, a federal court cannot grant habeas relief unless the state court decision "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or the decision "was based on an unreasonable determination of the

-58-

facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d).

We turn to the three additional issues for which Mr. Lockett has requested a COA: (A) whether voir dire interviews of 19 jurors outside his presence violated his due process rights; (B) whether trial counsel was ineffective for failing to marshal evidence of mental illness during the penalty phase; and (C) whether the jury instruction regarding the weighing of aggravating and mitigating circumstances was constitutionally deficient.

## A. *Voir Dire Interviews Outside Mr. Lockett's Presence*

Mr. Lockett asserts that his due process rights were violated when the trial court held voir dire interviews with 19 jurors outside of his presence. The OCCA and the district court rejected this claim, and the district court concluded that a COA was not warranted. We deny Mr. Lockett's motion for a COA on this ground.

### 1. *Legal Background*

A defendant has a due process right to be present during critical stages of trial, which may include the voir dire process. *See Gomez v. United States*, 490 U.S. 858, 873 (1989). The right to be present during voir dire is not absolute, however.

In *Snyder v. Massachusetts*, 291 U.S. 97 (1934), *overruled in part on other grounds by Malloy v. Hogan*, 378 U.S. 1 (1964), the Supreme Court noted that the Fourteenth Amendment did not grant "the privilege of presence when presence would be useless, or the benefit but a shadow." *Id.* at 106-07. "[T]he presence of a defendant is a condition of due process to the extent that a fair and just hearing would be thwarted by

his absence, and to that extent only." *Id.* at 107-08.  In other words, the right to be present is limited to circumstances where a defendant's "presence has a relation, reasonably substantial, to the fullness of his opportunity to defend against the charge." *Id.* at 105-06.

In *Bland*, this court considered *Snyder* in a habeas appeal involving exclusion from voir dire.  459 F.3d at 1020.  The defendant in *Bland* was absent from individual voir dire discussions involving 32 jurors.  We noted that Mr. Bland had been present for the majority of voir dire proceedings and had sufficient opportunity to observe the jurors and participate in peremptory challenge decisions.  *Id.* at 1021.  We therefore determined that his presence during the specific portions of voir dire would have been "a mere shadow." *Id.* (quoting *Snyder*, 291 U.S. at 106-07).

2.  *Procedural Background*

The initial jury voir dire process for Mr. Lockett's trial lasted four days.  Mr. Lockett was present for all voir dire that took place in open court, but the trial judge held 19 individual conferences with jurors outside his presence.  Three of the 19 individuals were seated on the jury.

The trial judge held these individual conferences in chambers or at the bench.  Mr. Lockett's trial counsel was present at all individual conferences, and they were conducted on the record.  Only the trial judge was permitted to ask questions of the jurors.  Of the 19 jurors questioned outside Mr. Lockett's presence, 11 were removed and eight were

sent back to the jury panel for additional questioning in open court.[15]  Of these, five were

excluded via peremptory challenges and three were seated on the jury.

Mr. Lockett did not object to his absence from voir dire at the time.  At one point

during the individual conferences, the trial judge asked defense counsel if Mr. Lockett's

absence was a problem, and counsel responded that it was not.

3.  *Analysis*

Mr. Lockett's case is similar to our decision in *Bland.*  There we held that a

defendant's absence from 32 individual voir dire interviews did not violate his due

process rights because he was present for the majority of voir dire and because the trial

judge asked all questions.  459 F.3d at 1020.  Similarly, Mr. Lockett was absent from 19

individual voir dire interviews, was present for the majority of voir dire, and the trial

judge asked all questions during the individual conferences.

Mr. Lockett has offered no explanation as to why his presence was necessary

---

[15] During the individual conferences, 14 of the 19 jurors were questioned about their prior knowledge of the case.  Nine were excused immediately based on their responses.  Two jurors were questioned about their own criminal cases, and one was immediately excused because he had criminal charges pending in the same county court.  One juror asked to speak privately with the judge to disclose that he had lost a child and did not feel he could be impartial.  He was excused.  Two more jurors were questioned about their personal connections with law enforcement or correctional officers, but were not excused.

Mr. Lockett notes that the juror who was excused because of his own pending criminal charges was the sole black juror.  Mr. Lockett asserts in his COA motion that the trial court erred in dismissing this juror because Oklahoma law does not require dismissal because of pending criminal charges.  He does not argue this as a separate claim, however, and he does not explain how his presence at this voir dire interview would have prevented the alleged error.

during the challenged portions of voir dire. He does not claim that he was prevented from effectively assessing the jurors or from participating in peremptory challenge decisions. And nothing in his arguments or in the record suggests he was prejudiced by his absence from these limited portions of voir dire.

We therefore deny his motion for a COA on this ground.

### B. *Trial Counsel's Handling of Evidence of Mental Illness*

Mr. Lockett asserts that his counsel was ineffective because he failed to present available evidence that Mr. Lockett suffered from specific mental illnesses. The OCCA and the district court rejected this claim, and the district court concluded that a COA was not warranted. We agree and deny Mr. Lockett's motion for a COA on this ground.

### 1. *Procedural Background*

Before trial, counsel raised concerns about Mr. Lockett's mental health. A mental health evaluation was conducted, and a competency hearing was held in November 1999. The trial court found Mr. Lockett to be competent. Counsel next considered asserting an insanity defense, but opted against it after the defense's expert, Dr. Smith, concluded that Mr. Lockett was sane. Given the overwhelming evidence of Mr. Lockett's guilt, counsel shifted his focus to building a mitigation case. Counsel leveraged Dr. Smith's opinion that Mr. Lockett, although sane, suffered from mental health problems as a result of traumatic experiences during childhood and adolescence.

Counsel presented seven witnesses during the penalty phase, including three family members, Dr. Smith, and another mental health expert, social worker Joyce

Turner. Family members provided shocking details of Mr. Lockett's childhood trauma, including abandonment and severe abuse. The testimony of both experts established that these experiences would have negatively affected Mr. Lockett's brain development and his emotional development in ways that helped to explain his criminal activities and violent aggression, especially toward women.

Mr. Lockett argued to the OCCA that his counsel was ineffective for "failure to marshal and direct the evidence of his mental illness into a coherent defense strategy." *Lockett*, 53 P.3d at 424. He sought to supplement the record with testimony of a new expert who believed Mr. Lockett's mental health issues were more severe than Dr. Smith described.

The OCCA rejected this claim under *Strickland*, concluding that Mr. Lockett failed to establish either of the two *Strickland* requirements. It found that the record supported counsel's decision not to pursue an insanity defense, particularly because Mr. Lockett's own expert did not support the defense. It also determined that counsel's presentation of mental health evidence in his mitigation case was not deficient and that Mr. Lockett had not experienced any prejudice as a result of his counsel's performance.

The federal district court agreed with the OCCA's analysis. The district court also reviewed the report Mr. Lockett had presented from the new mental health expert and found that it "contain[ed] little additional information and [was] largely consistent with the mental health evidence presented" at trial. *Lockett*, No. CV-03-734 at 19. It therefore concluded that even if counsel had presented the additional expert at trial, the evidence

-63-

would have been cumulative and would not have affected the jury's verdict.

2. *Analysis*

Mr. Lockett has not established—nor has he even argued—that his counsel's performance fell below "the wide range of reasonable professional assistance." *Strickland*, 466 U.S. at 689.

As the district court noted, "[t]his is not a case where counsel overlooked and/or failed to discover powerful mental health evidence." *Lockett*, No. CV-03-734 at 18-19. Mr. Lockett does not dispute that trial counsel chose the correct strategy—he argues only that counsel might have done a more persuasive job at it. Even if this is true, it falls far short of demonstrating that his counsel's performance fell "below an objective standard of reasonableness" as required under the *Strickland* standard. 466 U.S. at 688.

Mr. Lockett has failed to show that reasonable jurists could debate whether the district court correctly resolved this issue. We therefore deny a COA.

C. *Jury Instruction on the Weighing of Aggravating and Mitigating Circumstances*

Mr. Lockett's COA motion challenges the district court's conclusion that jury instructions in the penalty phase were constitutionally permissible. He argues that Supreme Court law does not allow a death sentence unless the jury finds that aggravating circumstances outweigh mitigating circumstances beyond a reasonable doubt.

Mr. Lockett's jury was given two separate instructions with respect to aggravating and mitigating circumstances. The first instruction advised the jury that it could issue a death sentence only if it unanimously found the presence of at least one aggravating

-64-

circumstance beyond a reasonable doubt.  The second instruction then required the jury to weigh the aggravating and mitigating circumstance(s) and allowed a death sentence only if the jury unanimously found that aggravating circumstance(s) outweighed mitigating circumstance(s).  In other words, the "beyond a reasonable doubt" standard was attached to the first step but not to the second step of weighing aggravating and mitigating circumstances.

The OCCA and the district court rejected this claim of error, concluding that Oklahoma's jury instructions complied with Sixth Amendment requirements as articulated by Supreme Court case law.  The district court further concluded that a COA was not warranted.  We deny Mr. Lockett's motion for a COA on this ground.

1.  *Legal Background*

In *Apprendi v. New Jersey*, 530 U.S. 466 (2000), the Supreme Court held that "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt."  *Id.* at 490.

In *Ring v. Arizona*, 536 U.S. 584 (2002), the Court extended this rule to capital cases.  In *Ring*, the Supreme Court addressed a capital defendant's right to a jury trial. Arizona law required that aggravating circumstances be found beyond a reasonable doubt before a death sentence could be imposed.  *Id.* at 588.  However, state procedure allowed the trial judge to determine the appropriate sentence once a jury had found the defendant guilty of first degree murder.  *Id.* at 592-93.  This procedure authorized the judge to

sentence the defendant to death if the judge found at least one aggravating circumstance and no mitigating circumstance substantial enough to justify leniency. *Id.* The Supreme Court held that this scheme violated the Sixth Amendment because it allowed a death sentence to be imposed where the required aggravating circumstance had not been found by a jury beyond a reasonable doubt as required by Arizona law. *Id.* at 609.

In short, *Apprendi* and *Ring* stand for the proposition that any fact finding that *increases a sentence beyond the statutory maximum* must be determined by a jury beyond a reasonable doubt. In the context of a capital case, the finding of at least one aggravating circumstance is generally a statutory prerequisite for a sentence of death and therefore falls under this requirement. Notably, neither *Apprendi* nor *Ring* held that the Sixth Amendment itself requires any particular standard of proof with respect to the weighing of aggravating and mitigating circumstances.

In the present case, the constitutionality of the challenged jury instructions depends in large part on whether they comply with Oklahoma law. Oklahoma's statutory scheme requires that, in recommending a death sentence, the jury

> shall designate in writing . . . the *statutory aggravating circumstance or circumstances which it unanimously found beyond a reasonable doubt*. . . . [but] if it is found that any such aggravating circumstance is outweighed by the finding of one or more mitigating circumstances, the death penalty shall not be imposed.

Okla. Stat. tit. 21, § 701.11 (emphasis added); *see also Torres v. Oklahoma*, 58 P.3d 214, 216 (Okla. Crim. App. 2002). This language requires that jurors find the presence of

aggravating circumstances beyond a reasonable doubt before they may consider a death

sentence. Once this finding is made, the statute explicitly authorizes a sentence of death.

2. *Procedural Background*

At the trial, Mr. Lockett's counsel submitted a proposed jury instruction that

allowed the jury to impose a death sentence only if it first concluded that aggravating

circumstances outweighed mitigating circumstances beyond a reasonable doubt. The trial

court did not adopt this instruction and instead gave Oklahoma's uniform instructions,

which provide:

> Should you unanimously find that one or more aggravating circumstances existed beyond a reasonable doubt, you are authorized to consider imposing a sentence of death.
>
> If you do not unanimously find beyond a reasonable doubt that one or more of the aggravating circumstances existed, you are prohibited from considering the penalty of death.

Okla. Unif. Jury Instr. Criminal 2d 4-76.

> If you unanimously find that one or more of the aggravating circumstances existed beyond a reasonable doubt, the death penalty shall not be imposed unless you also unanimously find that any such aggravating circumstance or circumstances outweigh the finding of one or more mitigating circumstances.

*Id.* at 4-80.

The OCCA addressed the merits of this issue on direct appeal in a separate slip

opinion.[16] It denied relief, finding that Oklahoma's uniform jury instructions used in Mr. Lockett's case accurately reflected Oklahoma statutory requirements and that the overall scheme was constitutional.

The OCCA reviewed the Oklahoma statute and determined that once jurors find the presence of at least one aggravating circumstance beyond a reasonable doubt, the statute explicitly authorizes a sentence of death, and death then becomes the prescribed statutory maximum sentence. *See* Okla. Stat. tit. 21, § 701.11; *Torres*, 58 P.3d at 216. The OCCA therefore reasoned that the *Apprendi*/*Ring* requirement—that any finding that extends punishment beyond a statutory maximum must be determined beyond a reasonable doubt—does not apply. Rather, the OCCA understood *Ring* to require only "that jurors make the [initial] factual finding of an aggravating circumstance beyond a reasonable doubt." *Torres*, 58 P.3d at 216. It concluded that the challenged instructions met this requirement.

The federal district court affirmed this conclusion. It determined that *Ring* was not applicable to the Oklahoma scheme because *Ring* focused on death eligibility whereas Mr. Lockett challenged an instruction involving the jury's discretionary decision among the sentences authorized by statute. The court stated that although *Ring* happened to involve facts in which a judge weighed aggravators and mitigators, the *Ring* holding did

---

[16] This slip opinion was not included in the record. Our understanding of the OCCA's reasoning is therefore drawn from Mr. Lockett's § 2254 petition and the federal district court's opinion.

not rely on or address the weighing process.

The federal district court pointed to Supreme Court and Tenth Circuit case law that undercut Mr. Lockett's reading of *Ring*. In *Kansas v. Marsh*, 548 U.S. 163 (2006), the Supreme Court said that "a State enjoys a range of discretion in imposing the death penalty, including the manner in which aggravating and mitigating circumstances are to be weighed." *Id.* at 174.

The federal court also pointed to our decision in *Matthews v. Workman*, 577 F.3d 1175 (10th Cir. 2009). In *Matthews*, the defendant challenged this same Oklahoma uniform jury instruction and sentencing statute, arguing that, under *Apprendi* and *Ring*, the jury should be instructed that it may not impose the death penalty unless aggravating circumstances outweigh mitigating circumstances beyond a reasonable doubt. *Id.* at 1195. We flatly rejected this claim, holding that the jury's weighing of aggravating and mitigating factors "is not a finding of fact subject to *Apprendi*, but a 'highly subjective, largely moral judgment regarding the punishment that a particular person deserves.'" *Id.* at 1195 (quoting *United States v. Barrett*, 496 F.3d 1079, 1107 (10th Cir. 2007)).

3. *Analysis*

We agree with the district court that Mr. Lockett's arguments are foreclosed by our decisions in *Barrett* and *Matthews*. Mr. Lockett has offered no reason why we should reverse this precedent. This issue therefore needs no further analysis, and we deny Mr. Lockett's request for a COA.

*   *   *

Having concluded that Mr. Lockett is not entitled to a COA on any of the three additional issues proposed, we deny Mr. Lockett's motion to expand COA.

## V. CONCLUSION

For all of the foregoing reasons, we affirm Mr. Lockett's conviction and death sentence.